THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
CHRISTOPHER LOLISCIO, Appellant.

Second Department, February 22, 1993

### APPEARANCES OF COUNSEL

*Roger Bennet Adler, P. C.,* New York City, for appellant.

*James M. Catterson, Jr., District Attorney* of Suffolk County, Riverhead *(Mark D. Cohen, Steven A. Hovani* and *Michael J. Miller* of counsel), for respondent.

### OPINION OF THE COURT

BRACKEN, J. P.

■ In the exercise of our factual review powers (CPL 470.15 [5]; *People v Bleakley,* 69 NY2d 490), we find that although the evidence was sufficient to support the jury's verdict convicting the defendant of intentional murder (Penal Law § 125.25 [1]), it was not sufficient to support the jury's verdict convicting the defendant of rape (Penal Law § 130.35 [1]) and felony murder (Penal Law § 125.25 [3]). We, therefore, modify the judgment of conviction to reflect that determination.

On the morning of Easter Sunday, March 26, 1989, at approximately 9:00 A.M., a man walking along Shore Road, near the waterline of Scott's Cove in Setauket, New York,

discovered the body of a 14-year-old girl. The body was lying face down, near the high water mark of Scott's Cove, was covered by salt grasses, and appeared to have been washed over by the tide.

A police officer arrived at the scene at approximately 9:22 A.M. This officer was followed by members of the Setauket Fire Department, by members of the Suffolk County Homicide Squad, and at approximately 1:18 P.M. by Dr. Stuart Dawson, the Suffolk County Medical Examiner.

Dr. Dawson would later conduct an autopsy and testify that, in his opinion, the victim had died as a result of manual strangulation and traumatic head injuries prior to 2:30 A.M. on March 26, 1989. Dr. Dawson would also testify that the victim had been placed on her back for at least one-half hour after having been killed and before having been left at the site noted above. The time frame furnished by Dr. Dawson is roughly consistent with that furnished by a Professor of Physical Oceanography at the State University of New York at Stony Brook, who testified that the body of the decedent had been left, face down, in the shallow water of Scott's Cove no later than 2:10 A.M., give or take 10 minutes, on the morning of Easter Sunday, 1989.

On March 29, 1989, an investigating detective spoke to an attorney, who stated that information concerning the homicide could be provided by a Stony Brook family by the name of Loliscio. In subsequent, consensually recorded statements, the defendant Christopher Loliscio acknowledged that he had received a telephone call from the victim at approximately 11:45 P.M. on March 25, 1989, a few hours before the homicide. The defendant also asserted that during this conversation the decedent "asked [him] what [he] was doing that night" and that he "told her that [he] was going out with [his] girlfriend". The defendant also told the detective that "the only time I ever met [the victim] was at the [Stony Brook] bowling alley".

On March 31, 1989, the investigating detectives contacted the defendant's girlfriend, Nicole Vento, and later obtained a written statement from her, which was sworn to on April 3, 1989. According to Ms. Vento's statement, the last time she had seen the defendant prior to the homicide was at approximately 11:15 or 11:30 P.M. on Saturday evening, as he left a party at the home of Jim Kern, which they both had attended. She added that later, at approximately 12:00 midnight, she had seen the defendant's car travelling south on Hallock Road

in a direction leading toward the victim's home. The defendant's mother would later testify that, a few minutes later, at 12:15 A.M. on the morning of Sunday the 26th, the decedent had again called the defendant's home and had again asked for the defendant.

Ms. Vento informed the detectives that on Monday, March 27, the day after the homicide, the defendant had asked her to furnish an alibi for him for the night of March 25th. She also stated that on the following Tuesday he asked her to furnish an alibi which would extend to 1:00 A.M. on the morning of March 26th. She told detectives that in later conversations the defendant called her "dumb" for having told another person about their "story". She also informed detectives that the defendant was later to tell her "the truth", that is, that after having left the Kern party on March 25, he had obtained a bottle of liquor at his home and had spent the rest of the evening driving around by himself.

On April 20, 1989, prompted by their knowledge of the defendant's efforts to contrive a false alibi, and by other information gathered during the course of their investigation, the police executed a search warrant on the defendant's automobile. This search yielded material fibers taken from a shirt found inside the car, which were later found to be consistent with head hair combings of the victim, as well as other fibers taken from the floor of the car, which were later found to be consistent with synthetic fibers recovered from the victim's shirt.

On June 29, 1989, the County Court (Cacciabaudo, J.), directed the petitioner to provide a sample of his blood. A subsequent application for a writ of prohibition was dismissed by this Court by order dated September 26, 1989 (Matter of Anonymous v Cacciabaudo, 153 AD2d 856). The defendant later furnished a sample of his blood and this was compared with traces of sperm recovered from the victim's body.

As would later be described by Dr. Harold Deadman, employed by the DNA analysis unit at Federal Bureau of Investigation (hereinafter FBI) laboratory in Washington, D.C., the semen taken from the victim's body corresponded with the blood taken from the defendant. According to this expert, the chances of this match occurring coincidentally was one in 21 million. The FBI issued its report on December 12, 1989. The defendant was arrested the next day, December 13, 1989, and was eventually brought to trial before a Suffolk County jury.

In light of the forensic evidence noted above, the defendant could not but concede at trial that he had lied to the police during their investigation and that, in fact, he had engaged in sexual intercourse with the victim shortly before her death. However, he argued at trial, and continues to argue on appeal, that there is a hypothesis of innocence which has not been disproved. He argues that it is conceivable that he had consensual sexual intercourse with the victim during the approximately 45-minute or one-hour interval which elapsed between 12:15 A.M. (as of when the victim, as revealed by her last telephone call to the Loliscio residence, had yet to meet with defendant) and 1:10 A.M. (as of when, according to a defense witness, the defendant returned home), and that some unknown third party committed the murder after he had parted with the victim at a "7-11" store in Setauket (where she was allegedly seen by another defense witness). We conclude that while the weight of the evidence establishes that the defendant intentionally murdered his victim after having had sexual intercourse with her, the weight of the evidence does not establish that the sexual encounter which preceded the murder was nonconsensual.

There is overwhelming evidence of the defendant's consciousness of guilt. Most obviously, there is the evidence of his lies to the police and his attempt to create a false alibi, noted above. Furthermore, there is evidence which tends to show that the defendant altered his appearance after the homicide, that he inexplicably learned, within only a few minutes, of the discovery of the body on the edge of Scott's Cove on Sunday morning, that he was seen vacuuming his car on the following Monday, and that, after his arrest, he spontaneously stated, among other things, "you don't have me good enough".

The overwhelming proof of consciousness of guilt is to be viewed in conjunction with other items of evidence. There was evidence which tended to show that the defendant was uninjured before the homicide, but had deep scratches on his arm afterwards. There was also evidence that an unidentified prison inmate told a police officer that the defendant had told him (the inmate) that he (the defendant) had murdered the deceased. (Although the inmate's statement to the detective was hearsay, it was elicited by defense counsel.)

Most importantly, the People's "hypothesis of guilt" as to the count of intentional murder must be accepted because of the inherent improbability of the defendant's "hypothesis of innocence" as to that charge. To accept the defendant's hy-

pothesis of innocence, one would have to assume that within several minutes after she parted company with the defendant, the victim met with some unknown third person or persons who, either requiring no motive to kill or acting upon some motive which arose within a matter of another few minutes, took the victim to some unknown location, killed her, moved her body from that location to Scott's Cove, and then escaped without leaving a trace—all within approximately one and a half hours. In light of the improbability of this scenario, considered together with the corroborative evidence outlined above, the jury was entitled to conclude, to a moral certainty, that no person other than the defendant had an opportunity to commit the murder in question.

The defendant's manifest consciousness of having committed a crime, the unlikelihood of an undetected murderer having intervened in the brief period which elapsed between the defendant's last contact with the victim and the time of the victim's death, and the additional corroborating evidence, including that noted above, all establish the defendant's guilt of intentional murder beyond a reasonable doubt, and to a moral certainty *(see, e.g., People v Lewis,* 64 NY2d 1111 [victim's body found September 15, 1981; defendant, last to see victim alive on September 10, claimed to have left victim on September 11; evidence of motive, flight from State, false statements to investigators, alteration of appearance]; *People v McCullough,* 141 AD2d 856 [defendant last seen with victim on October 3, 1984; time of death estimated October 3-4; body discovered October 11; evidence that defendant knew death was by stabbing before this had been reported; defendant's car seen near site where body dumped; evidence of false statements to police]; *People v De Oliveira,* 116 AD2d 770, 772-773 [the "prosecution established motive, opportunity and identification of defendant near scene where the victim's body was found, as well as incriminating statements * * * which the jury could have interpreted as admissions"]; *People v Gordon,* 111 AD2d 409, *cert denied* 474 US 1009 [defendant last seen with eight-year-old victim at 8:15 P.M. in elevator of building; witness heard noise five minutes later; victim's shattered body later found on building terrace; damaging statements by defendant]). Given the "factual matrix" of this case *(People v Jackson,* 65 NY2d 265, 272), we conclude that the People proved that Christopher Loliscio was the only person to have had an opportunity to carry out the murder of the decedent.

The evidence described above removes any reasonable doubt

as to the defendant's guilt of intentional murder; however, this same evidence fails to establish to a moral certainty that the murder was the culmination of a rape by forcible compulsion as hypothesized by the People. There was, in other words, factually insufficient proof that the defendant raped the victim before he killed her.

As described above, the weight of the evidence is inconsistent with the defendant's hypothesis of innocence as to the crime of intentional murder because there is no reasonable possibility that another person had the opportunity to accost the victim, carry out her murder, and dispose of her body within the brief time frame hypothesized by the defendant. However, the same evidence is *not* necessarily inconsistent with the defendant's hypothesis of innocence as to the crime of rape. The demonstrated improbability of an unknown perpetrator's having had an opportunity to carry out the murder logically supports the inference that the murderer was none other than the defendant, but does nothing to support the inference that this murder was preceded by a rape by forcible compulsion. There is, in other words, a failure of proof as to the charge of rape.

Initially, there is a complete lack of any foundation for the inference that any coercive abduction was involved in the victim's meeting with the defendant on the night in question. Further, forcible sexual intercourse was not proved by the physical evidence. Dr. Dawson, the Medical Examiner, testified that there were no "defensive wounds" present on the body and that, based on his examination of the vaginal area, he was unable to conclude that the intercourse had been forcible, as opposed to consensual. In light of the foregoing, we cannot agree with the People that the weight of the evidence is inconsistent with the defendant's hypothesis of innocence as to rape *(cf., People v Barnes,* 162 AD2d 1039 [body discovered September 19; defendant seen with victim September 18; forensic evidence linked victim to defendant's truck; evidence that defendant admitted murder to inmate]; *People v Johnston,* 147 AD2d 589). Under these circumstances, therefore, we conclude that the defendant's conviction for rape, and for felony murder based on rape, must be vacated *(see, People v Slaughter,* 78 NY2d 485; *People v Bornholdt,* 33 NY2d 75; *People v Joyner,* 26 NY2d 106; *People v Angel,* 158 AD2d 145; *People v Smith,* 152 AD2d 56; *People v Reynolds,* 107 AD2d 724; *People v Padilla,* 146 AD2d 813; *People v Rice,* 61 AD2d 758).

■ The defendant also contends that the jury's receipt of derogatory information concerning him, and also the deceased, from extrajudicial sources deprived him of a fair trial. We disagree.

In order to impeach a jury verdict, the defendant must demonstrate not only the infiltration of unduly prejudicial information to the jury during deliberations, but also that such information unduly prejudiced him at trial. While it is true that a defendant's right to confront witnesses and the right to due process are implicated when extraneous information enters into jury deliberations *(Parker v Gladden,* 385 US 363; *People v De Lucia,* 20 NY2d 275), it is also true that there must be a strong showing of improper influence on the jury and, unless there is an instance of inherently prejudicial conduct, the facts of each case must be examined to see if prejudice to the defendant was engendered *(People v Brown,* 48 NY2d 388, 394; *People v Carthrens,* 171 AD2d 387, 393). In this case, after the verdict was returned, the trial court questioned each juror independently in the presence of the parties. All the jurors stated that the rumors played no part in the decision-making process. The extent to which the parties may participate in questioning the juror, among other things, is left to the sound discretion of the court *(United States v Ianniello,* 866 F2d 540, 544; *see also, United States v Calbas,* 821 F2d 887, 896, *cert denied* 485 US 937; *People v Chamberlain,* 178 AD2d 783, 784; *People v Simms,* 176 AD2d 833, 834; *People v Castillo,* 144 AD2d 376, 377-378).

In the present case, the trial court, upon inquiry, learned that each of the jurors had heard that there was some question about the *victim's* sexual background. In this context, any extrajudicial information about the victim's character would tend to support the defendant and cannot be considered prejudicial to him. Although four of the jurors had heard something about the defendant, each affirmed that the rumors played absolutely no part in the deliberations. Thus, the court made reasonable inquiry and established that the jury's verdict was based upon the trial evidence and that no prejudice inured to the defendant's detriment based upon the rumors *(see, e.g., People v Martin,* 177 AD2d 715, 716; *People v Castillo, supra,* at 378; *People v Costello,* 104 AD2d 947, 948-949; *compare, People v Redd,* 164 AD2d 34, 39-40).

The defendant further contends that the prosecutor's summation was improper and denied him a fair trial. To the

limited extent that the defendant's objections were preserved for appellate review, the prosecutor's challenged remarks either constituted fair response to defense counsel's summation, during which he challenged the credibility of key prosecution witnesses *(see, People v Williams,* 174 AD2d 494, 495; *People v White,* 173 AD2d 217; *People v Taylor,* 167 AD2d 363, 364), or were fair comment on the evidence and properly inferable therefrom *(see, People v Ocasio,* 180 AD2d 765; *People v Demott,* 178 AD2d 935; *People v Shepherd,* 176 AD2d 369, 370; *People v Lewis,* 175 AD2d 885, 886).

We have considered the defendant's remaining contentions and find them to be either unpreserved for appellate review or without merit.

ROSENBLATT, RITTER and PIZZUTO, JJ., concur.

Ordered that the judgment is modified, on the facts, by reversing the convictions for murder in the second degree under the third count of the indictment and rape in the first degree under the fourth count of the indictment, vacating the sentences imposed thereon, and dismissing those counts of the indictment; as so modified, the judgment is affirmed.