Christopher LOLISCIO, Petitioner–Appellant,

v.

Glenn GOORD, As Warden, Clinton Correctional Facility, Respondent–Appellee.

Docket No. 00–2594.

United States Court of Appeals, Second Circuit.

Argued May 15, 2001.

Decided Aug. 30, 2001.

---

Richard M. Asche, Litman, Asche & Gioiella, LLP, New York, NY, for Petitioner–Appellant.

Mark Cohen, Assistant District Attorney, Suffolk County, N.Y. (James M. Catterson, Jr., District Attorney of Suffolk County, Glenn Green, Assistant District Attorney, on the brief), for Respondent–Appellee.

Before FEINBERG, OAKES, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

Petitioner-appellant Christopher Loliscio appeals from a judgment of the United States District Court for the Eastern District of New York (Edward R. Korman, *Chief Judge*) dismissing pursuant to 28 U.S.C. § 2254(d)(1) his petition for a writ of habeas corpus. Petitioner argues that (1) his rights to a jury trial and to confront his accusers under the Sixth Amendment of the United States Constitution were violated by the jury's consideration of extra-record rumors about his prior bad acts; (2) the trial court's post-verdict hearing concerning the effect of the rumors on the jury's deliberations abridged his Fourteenth Amendment due process rights; and (3) his Sixth Amendment right to effective assistance of counsel was violated by his trial counsel's (a) failure to have the victim's brassiere tested for salinity content, and (b) decision to introduce evidence of an alleged jailhouse confession by petitioner. Finding that the state court's rejection of these claims was neither contrary to nor an unreasonable application of clearly established Supreme Court prece-

dent, we affirm the district court's denial of the petition for habeas corpus.

## BACKGROUND

In January 1991, following a jury trial, petitioner was convicted in Suffolk County Court of two counts of murder in the second degree (intentional murder and felony murder) and rape in the first degree for the March 1989 killing of a fourteen-year-old girl, Jessica Manners (the "victim"). Petitioner was sentenced to concurrent terms of imprisonment of 25 years to life on each of the murder counts, and to a concurrent term of 8 ⅓ to 25 years on the rape count.

The evidence presented at trial indicated that petitioner and the victim had known each other prior to the victim's death. Sometime between 11:45 P.M. on March 25, 1989, and 12:15 A.M. on March 26, 1989, the victim contacted petitioner by telephone. *People v. Loliscio,* 187 A.D.2d 172, 174–75, 593 N.Y.S.2d 991 (2d Dep't 1993). After initially telling the police that he had not been with the victim the night of the murder, petitioner conceded at trial that he and the victim had engaged in sexual intercourse during the first hour of March 26th. *Id.* at 174, 176, 593 N.Y.S.2d 991. Petitioner's parents testified that petitioner had told them that he had thereafter dropped off the victim at a convenience store at approximately 1:00 A.M.

The victim's body was found by a passerby at approximately 9:15 A .M. the next morning (March 26, 1989) near Scott's Cove in Setauket, New York. The passerby testified that he saw the body of a girl lying face down in spartina grass at the high tide mark and that the body appeared to be tide-washed. *Id.* at 174, 593 N.Y.S.2d 991. The medical examiner determined that the primary causes of death were strangulation and blunt-force head trauma, and that the time of death was no later than 2:30 A.M. on March 26th. *Id.* at 174, 593 N.Y.S.2d 991. A prosecution expert testified that the body was placed on the beach no later than 2:52 A.M. on March 26th.

Petitioner's girlfriend, Nicole Vento, testified that on March 27th and 28th petitioner implored her to provide him with an alibi for the night of the murder. *Id.* at 175, 593 N.Y.S.2d 991. Petitioner's mother testified that petitioner had taken his car to a car wash on March 26th. There was testimony by petitioner's neighbors that petitioner thoroughly vacuumed his car at approximately 7:30 A.M. on the morning of March 27th, and that no member of the Loliscio household had theretofore been seen cleaning a car at that time of day. *Id.* at 176, 593 N.Y.S.2d 991. Another witness testified that she observed deep cuts and scratches on petitioner's arms on March 29th, but had not seen such cuts and scratches one week earlier. *Id.* at 176, 593 N.Y.S.2d 991. This testimony was contradicted, however, by (1) Nicole Vento's testimony that she did not notice any such cuts or scratches when she saw petitioner on the day after the murder, and (2) photos of petitioner taken the day after the murder. Another witness testified that, on March 29th, she observed petitioner with an uneven haircut with clumps of hair missing and wearing glasses, and that she had never seen him wear glasses during the previous year. *Id.* at 176, 593 N.Y.S.2d 991. On the basis of this testimony, the prosecution argued that petitioner had attempted to change his appearance after the murder.

The lead police investigator, Detective White, testified during cross-examination that, shortly after the murder, a woman reported to the police that her boyfriend had told her that he, rather than petitioner, had killed the victim. Detective White also testified, however, that the woman later told police that she did not believe

her boyfriend. A defense witness testified that, between 2:30 and 2:45 A.M. on March 26th, she drove past the area where the victim's body had been found and saw two young males standing near a tan Toyota pickup. There was also testimony that the victim's ex-boyfriend had a friend who drove a tan Toyota.

On April 20, 1989, the police executed a search warrant on petitioner's car. The search yielded (1) a shirt found inside the car that contained head hair combings consistent with the victim's hair, and (2) fibers taken from the floor of the car later found to be consistent with synthetic fibers recovered from the victim's shirt. *Id.* at 175, 593 N.Y.S.2d 991. Petitioner's blood was thereafter compared with traces of semen recovered from the victim's body, and the two were found to match. A prosecution expert testified that the chance of this match occurring coincidentally was one in 25 million. On the other hand, the fibers found in the car did not match the fibers found under the victim's fingernails.

Petitioner was arrested and taken to police headquarters on December 13, 1989. A detective testified that, when petitioner was told that he would have to remove his clothes for processing, petitioner stated: "You don't have me good enough."

The jury trial commenced on October 15, 1990. During cross-examination of Detective White, defense counsel elicited testimony (1) that a jailhouse informant had reported to White that petitioner had confessed to murdering the victim; and (2) that White had subjected the informant to a lie detector test. When defense counsel then asked White if the informant had failed the test, the trial court sustained the prosecution's objection to the question.

Jury deliberations began on November 16, 1990, and concluded on November 20th. At approximately 6 P.M. on November 17, 1990, Jurors Wolford and Kelly sent the following note to the trial judge:

In the heat of deliberations, two unsubstantiated rumors—one concerning each, the defendant and the deceased—were brought forward. Although all jurors agree that this would not in any way bias them on reaching a verdict, I would like this brought out just right now.

The trial court then questioned the two jurors *in camera* about the rumors. Kelly stated that only she and Wolford had heard the rumors, while Wolford stated that one or two other jurors had also heard it. Wolford also stated that the rumors were introduced by a juror other than he or Kelly. The trial court instructed the two jurors not to discuss this colloquy with the other jurors.

The next morning, relying on the note's representation that all the jurors agreed that the rumors would not in any way bias them in reaching a verdict, the trial court decided to take no further action with respect to the rumors, and deliberations were permitted to resume. The trial court specifically rejected defense counsel's request to give a curative instruction to the jury.

On November 20th, the jury returned a verdict of guilty on two second-degree murder counts (intentional murder and felony murder) and a first-degree rape count. Immediately after the verdict was announced, the trial court questioned each of the twelve jurors individually about the rumors that were introduced during deliberations. Wolford answered as follows:

What was said—and I did not hear it in its entirety—what I heard is something concerning allegations of unlawful imprisonment concerning the defendant. And I don't know how many people did hear it. It was at one end of the table and discussions were going on, myself and of course Miss Kelly that did hear it felt very strongly it should be brought forth.

At that point somebody said it was just a rumor. "I heard a rumor that Jessica Manners was a prostitute." I think we both then basically, in discussing, it was never mentioned again what it was, what was said to start the whole damn business going. And I just said I don't care. I got to bring it forth.

Kelly stated that she had heard that petitioner "had been arrested before for a similar act ... but he was never convicted" and that she was unsure how many other jurors heard this. Juror Holland stated that he had heard that petitioner had been "in trouble before," and that the victim was promiscuous or that she was a prostitute. Juror Arciero stated that she had heard that petitioner had "had some trouble with the law," and that the victim was a prostitute. Jurors Goff, Mitchell, Garen, Nicolazzi, Lewis, Wheeler, Doyle, and Barone stated that they had heard that the victim was promiscuous. The trial court also asked each juror whether his or her vote was in any way based on the rumors. Each juror answered in the negative.

On direct appeal, the Appellate Division reversed and dismissed petitioner's convictions for rape and for felony murder based on rape on the grounds that "there [was] a complete lack of any foundation for the inference that any coercive abduction was involved in the victim's meeting with the defendant on the night in question," and "forcible sexual intercourse was not proved by the physical evidence." *Loliscio*, 187 A.D.2d at 178, 593 N.Y.S.2d 991. The Appellate Division affirmed the intentional murder conviction, however, basing its decision on "[t]he defendant's manifest consciousness of having committed a crime, the unlikelihood of an undetected murderer having intervened in the brief period which elapsed between the defendant's last contact with the victim and the time of the victim's death, and ... additional corroborating evidence," such as the cuts and scratches on petitioner's arms. *Id.* at 177, 593 N.Y.S.2d 991. Finally, the Appellate Division rejected petitioner's contention that he had been deprived of a fair trial by the jury's consideration of the rumors about his prior bad acts. *Id.* at 179, 593 N.Y.S.2d 991. The Court of Appeals denied petitioner's application for leave to appeal. *People v. Loliscio*, 81 N.Y.2d 1075, 601 N.Y.S.2d 595, 619 N.E.2d 673 (1993).

In July 1992, petitioner moved for a new trial, pursuant to New York Criminal Procedure Law § 440.10, on grounds, *inter alia*, of newly discovered evidence, namely, a scientific test of the salinity content of the victim's brassiere indicating that the victim's body had not at any time been submerged in sea water. Petitioner argued that this evidence proved, contrary to the testimony of the prosecution's expert witness at trial, that the body must have been placed at Scott's Cove *after* 2:50 A.M. When combined with defense testimony that petitioner had returned home at approximately 1:15 A.M., petitioner argued, this salinity-content evidence established his innocence. The County Court denied the motion for a new trial based upon a finding that the evidence could have been discovered with reasonable diligence prior to trial.

In 1997, petitioner brought a second Section 440.10 motion, alleging that his trial counsel had been ineffective in (1) eliciting from Detective White testimony about petitioner's alleged jailhouse confession, and (2) failing to have a salinity test performed on the brassiere. The County Court denied the motion, finding that trial counsel had provided "meaningful representation."

In April 1997, petitioner filed the present habeas petition in federal district court. The district court ordered an evidentiary hearing regarding petitioner's

two ineffective assistance claims, at which petitioner's trial counsel, Paul Gianelli, was the sole witness. With respect to the confession, Gianelli testified that in eliciting White's testimony about the confession, he hoped to show that the prosecution's case was so weak that the prosecution had to resort to jailhouse snitches. With respect to the failure to have the salinity test performed, Gianelli testified that ordering such a test did not occur to him and that he instead asked the jurors to examine the brassiere for themselves and observe that it had not been submerged in sea water. On March 2, 2000, the district court heard oral argument on the ineffective assistance claims and petitioner's claim that his Sixth Amendment rights were violated by the jury's consideration of the rumors about his prior bad acts. In an oral opinion rendered September 11, 2000, the district court denied the petition but issued a certificate of appealability with respect to the Sixth Amendment claim and the two ineffective assistance claims. Petitioner thereafter timely appealed.

## DISCUSSION

■ We review a district court's denial of a petition for a writ of habeas corpus *de novo*. *English v. Artuz,* 164 F.3d 105, 108 (2d Cir.1998).

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). "[C]learly established Federal law, as determined by the Supreme Court of the United States" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state-court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Supreme Court and nevertheless arrives at a result different from [that] precedent." *Id.* at 405–06, 120 S.Ct. 1495. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. In determining whether an application was objectively unreasonable, "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 120 S.Ct. 1495. Interpreting *Williams,* we have added that although "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks and citations omitted).

## I. Petitioner's Sixth Amendment Claim

■ Under the Sixth Amendment, a criminal defendant has a right to a trial by jury and the right to confront his accus-

ers. U.S. Const. amend. VI. "[T]rial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). Hence, a criminal defendant's Sixth Amendment rights are implicated when a jury considers incriminating evidence that was not admitted at trial. A determination that a petitioner's Sixth Amendment rights have been violated by a jury's consideration of extra-record information is not sufficient to grant a writ of habeas corpus, however. The court must also determine beyond a reasonable doubt that this constitutional error was not harmless. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[1] Because the determination of whether a petitioner's Sixth Amendment rights have been violated by the jury's consideration of extra-record information requires a determination of whether the extra-record information had a prejudicial effect on the verdict, *see United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970) (stating that the issue is "not the mere fact of infiltration of some molecules of extra-record matter, with the supposed conse-

quences that the infiltrator becomes a 'witness' and the confrontation clause automatically applies, but the nature of what has been infiltrated and the probability of prejudice"), we typically proceed immediately to the harmless error determination, assuming without deciding that a Sixth Amendment violation has occurred. *See Bibbins v. Dalsheim*, 21 F.3d 13, 16–17 (2d Cir.1994) (applying *Brecht* harmless error standard); *United States v. Simmons*, 923 F.2d 934, 943 (2d Cir.1991) ("More recently, we have treated the issue of extra-record infiltration only from the perspective of the resulting prejudice to the defendant, without discussing the source of the error.... [W]e need not determine whether appellants' Sixth Amendment rights were violated because we conclude that any such violation was harmless.") (citing *United States v. Weiss*, 752 F.2d 777, 782–83 (2d Cir.1985); *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.1983)).

Petitioner contends that his Sixth Amendment rights were violated by the jury's consideration of the rumors concerning petitioner's prior bad acts. Relying upon the jurors' post-verdict affirmations that "the rumors played absolutely no part in the deliberations," the Appellate Division rejected this argument. *Loliscio*, 187 A.D.2d at 179, 593 N.Y.S.2d 991. Relying both on the jury's pre-verdict note assur-

---

1. Between 1993 and the passage of AEDPA in 1996, we applied in habeas cases the harmless error standard established in *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted), under which a petitioner was required to show that the constitutional error "had a substantial and injurious effect or influence in determining the jury's verdict." In other words, the petitioner had to demonstrate "actual prejudice." *Id.* at 637, 113 S.Ct. 1710; *see also O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (holding that where a habeas court is in "grave doubt" about whether an error

had a substantial and injurious effect on the verdict, the writ should be granted). As we have previously noted, however, AEDPA's passage has given rise to the question of whether a federal habeas court should continue to apply the *Brecht* standard or determine instead whether the state court's decision was contrary to, or involved an unreasonable application of the *Chapman* harmless error standard. *See Noble v. Kelly*, 246 F.3d 93, 101 n. 5 (2d Cir.2001). Because we conclude that petitioner has failed to establish harmfulness under either standard, we need not decide this question today.

ing the trial court that the jurors would not take the rumors into account and the jurors' post-trial statements that the rumors did not influence their verdict, the district court concluded that the Appellate Division's decision that the rumors had no significant effect on the jury's verdict did not constitute an unreasonable application of Supreme Court Sixth Amendment precedent.

The focus of petitioner's argument on appeal is the district court's reliance upon the jurors' subjective affirmations that the rumors had no effect on their votes. Petitioner argues that (1) the district court's reliance on these subjective statements was inconsistent with this Court's holding in *Bibbins v. Dalsheim,* 21 F.3d 13 (2d Cir.1994), that such evidence may not be considered in a habeas proceeding; and (2) once these subjective statements are excluded from the inquiry into whether his Sixth Amendment rights were violated by the jury's consideration of the rumors, it is evident that the state court's determination that his Sixth Amendment rights were not so violated constituted an unreasonable application of clearly established Supreme Court Sixth Amendment precedent. We consider these arguments *seriatim.*

### A. *Bibbins v. Dalsheim*

After his conviction on a state drug charge, petitioner Bibbins had moved for a new trial in state court based on the jury's consideration of extra-record information.

*Id.* at 15. In support of his motion, Bibbins submitted affidavits from two jurors. Juror Krainak averred that, in connection with the jury's consideration of a police officer's testimony identifying Bibbins as the person involved in the drug transaction, she had told the other jurors that there were no open businesses near the location at which the drug transaction took place. *Id.* Juror Urban's affidavit, among other things, described the effect this extra-record information had on his vote. *Id.* at 15–16. The trial court denied the motion. Bibbins then filed a federal habeas petition, submitting the same two affidavits in support thereof. Apparently without conducting an evidentiary hearing, the district court denied the petition. *Id.* at 16.

We began our consideration of the district court's denial by noting that the Federal Rules of Evidence apply in federal habeas proceedings. *Id.* (citing Fed. R.Evid. 1101(e)). We then noted that although Federal Rule of Evidence 606(b) permits "jurors to testify 'on the question whether extraneous prejudicial information was improperly brought to the jury's attention,' .... the juror may not go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." *Id.* (quoting Fed. R.Evid. 606(b)).[2] In other words, " '[w]here an extraneous influence is shown, the court must apply an objective test, assessing for itself the likelihood that

**2.** Rule 606(b) provides in full:

Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may tes-

tify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b).

the influence would affect a typical juror.'" *Id.* (quoting *Miller v. United States,* 403 F.2d 77, 83 (2d Cir.1968)). Applying this precedent, we held that "Urban's affidavit is ... inadmissible to the extent that it recounts how Ms. Krainak's disclosure affected the thinking and voting of individual jurors or the deliberations of the jury as a whole, including the tally of votes." *Id.* Relying on *Bibbins,* petitioner in this case argues that the district court erred in giving weight to the juror's subjective statements that the rumors had no effect on their votes.

Responding to this *Bibbins* argument, the state argues, first, that *Bibbins'* holding that Rule 606(b) applies in habeas proceedings is limited to federal habeas evidentiary hearings, and does not extend to federal court review of state court determinations with respect to the effect of extra-record information on the jury's deliberations.[3] We find this interpretation of *Bibbins* unpersuasive because, as noted, there is no indication that the district court in *Bibbins* conducted an evidentiary hear-

ing. As we are here, the *Bibbins* panel was presented with juror testimony that had initially been given in a state court proceeding and then was re-introduced in the federal habeas proceeding.

The state argues, second, that, assuming that petitioner's interpretation of *Bibbins* is correct, *Bibbins* requires the "application of federal evidentiary rules to state court proceedings"—thereby "essentially federaliz[ing] state evidentiary proceedings"—a requirement that is inconsistent with AEDPA's instruction to determine whether the state court "unreasonably applied" Supreme Court precedent. 28 U.S.C. § 2254(d)(1).[4]

We agree that *Bibbins*—a case decided two years prior to the passage of AEDPA—appears to be in some tension with the heightened degree of deference to state court decisions mandated by AEDPA. *See Williams v. Taylor,* 529 U.S. 362, 386, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (plurality opinion) (emphasis added) ("[I]t seems clear that Congress [in enacting

---

**3.** Similarly, the district court found that *Bibbins* is inapplicable to the present case because "[i]n that case there was no questioning of the jurors and so the Court was simply saying that in the context of the federal *habeas* proceeding a federal Judge could not undertake ... an inquiry of the jurors to determine what it is they reached their verdict on."

**4.** Similarly, the district court opined that *Bibbins* was wrongly decided because Rule 606(b) is "trumped" by 28 U.S.C. § 2254(d)(2), which provides that a habeas petition should be granted where the state court's adjudication of the petitioner's federal claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."

This critique of *Bibbins* is misguided because it erroneously assumes that the Appellate Division's determination that "no prejudice inured to the defendant's detriment based upon the rumors" was a finding of fact. *Loliscio,* 187 A.D.2d at 179, 593 N.Y.S.2d

991. A court's determination of whether a petitioner was prejudiced by a jury's consideration of extra-record information is clearly a mixed question of law and fact. *See Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir. 1997) ("Whether an instance of juror misconduct was prejudicial to the defendant is a mixed question of law and fact which we review de novo."); *cf. Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (stating that question whether petitioner was prejudiced by the objectively unreasonable conduct of his attorney is a mixed question of law and fact). Hence, as the district court subsequently recognized, the state courts' prejudice determination should be viewed under 28 U.S.C. § 2254(d)(1), which provides that the petition should be granted where the state court's adjudication of the petitioner's federal claim resulted in a decision that was "contrary to, or an unreasonable application of" Supreme Court precedent. The district court's considered opinion thus appears to have been that Rule 606(b) is trumped by Section 2254(d)(1).

AEDPA] intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ."). It is one thing to say that Rule 606(b) applies to juror testimony introduced for the first time in a federal habeas evidentiary hearing, but quite another to say that, in reviewing a state court's determination of whether a defendant was prejudiced by the jury's consideration of extra-record information, a federal habeas court should "independent[ly] determin[e]" whether the petitioner was prejudiced by the extra-record information without the benefit of any juror testimony that offends Rule 606(b)—even if such testimony had been relied upon by the state court. *Bibbins*, 21 F.3d at 17. This latter claim is difficult to reconcile with AEDPA. *See Doan v. Brigano*, 237 F.3d 722, 735 n. 8 (6th Cir. 2001) ("In light of the deference to state proceedings called for by AEDPA, it seems strange indeed that a federal habeas court would apply its own rules of evidence despite a conflicting state rule when it is simply reviewing the state court record in making its determination, rather than holding an evidentiary hearing in federal court.").

In other words, *Bibbins* would appear to permit the following scenario: After a state court, relying on subjective juror testimony, rejects a defendant's Sixth Amendment claim predicated on jury consideration of extra-record information, the federal habeas court, excluding the subjective juror testimony pursuant to *Bibbins*, then determines that the petitioner's Sixth Amendment rights were violated. Such a result would be consistent with AEDPA only if there existed firmly established Supreme Court precedent providing that a court's consideration of such subjective juror testimony in determining whether a defendant's Sixth Amendment rights were compromised by the jury's consideration of extra-record information is itself a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). If this were the case, a petitioner could argue that a state court that had rejected his Sixth Amendment claim in reliance on such subjective testimony "unreasonably applied" clearly established Supreme Court precedent. *Id.* § 2254(d)(1). Because the Supreme Court has not established such a precedent, however, *Bibbins* appears to be inconsistent with AEDPA.[5]

5. To be sure, as petitioner notes, Rule 606(b) is based in part on *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917 (1892) (holding that "a juryman may testify to any facts bearing upon the question of the existence of any extraneous . influence, although not as to how far that influence operated upon his mind"). It is far from clear, however, that this holding is of the sort capable of supporting habeas relief. Under the federal habeas statute, habeas relief is available only where the custody was imposed "in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court has noted that, far from being based on the Constitution, *Mattox's* holding was derived from longstanding common law. *See Tanner v. United States*,. 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) ("By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict. Exceptions to the common-law rule were recognized only in situations in which an 'extraneous influence' was alleged to have affected the jury. In *Mattox*, this Court held admissible the testimony of jurors describing how they heard and read prejudicial information not admitted into evidence.") (internal citations omitted). State violations of federal common law rules are generally not cognizable in federal habeas proceedings. Habeas relief is available only where the federal common law rule is a "prophylactic" rule designed to protect an underlying constitutional right. *Withrow v. Williams*, 507 U.S. 680, 690–92, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). The *Mattox* rule embodied in Rule 606(b) is clear-

## B. The Effect of the Rumors on the Verdict

■ All of this said, we do not reach the question of *Bibbins'* vitality in the wake of AEDPA because, even without considering the jurors' subjective statements (in keeping with *Bibbins* ), we conclude that the Appellate Division did not unreasonably apply clearly established Supreme Court precedent in rejecting petitioner's Sixth Amendment claim.[6] We base our conclusion instead solely on the juror's objective statements, *see United States v. Calbas,* 821 F.2d 887, 896 n. 9 (2d Cir.1987) (stating that "[t]he district court was entitled to avail itself of ... [its] finding[ ]," based on post-verdict juror testimony, that "the jury preempted discussion of [extra-record] information" "in concluding that [petitioner] had not been prejudiced" because, "[w]hile ... the trial court's post-verdict determination of extra-record prejudice must be an objective one, ... it may appropriately consider the circumstances surrounding introduction of that information in making such a determination"); *see also Sassouni-*

*an v. Roe,* 230 F.3d 1097, 1109 (9th Cir. 2000) (stating that "the extent to which the jur[y] discussed and considered" extra-record information is a factor the court should consider in making prejudice determination).

The jurors' objective statements about "how they heard ... the prejudicial information not admitted into evidence," *Tanner,* 483 U.S. at 117, 107 S.Ct. 2739, and "the circumstances surrounding introduction of that information," *Calbas,* 821 F.2d at 896 n. 9, clearly indicate that "the extent to which the jur[y] discussed and considered [the rumors]," *Sassounian,* 230 F.3d at 1109, was quite negligible. When questioned by the trial court immediately after he had submitted the note about the rumors, juror Wolford surmised that one or two jurors other than he and juror Kelly had actually heard the rumors. This surmise was corroborated by the jurors' post-verdict objective statements. Juror Holland testified that he had heard that petitioner had been "in trouble before," and juror Arciero testified that she had heard

---

ly not such a prophylactic rule. *See Tanner,* 483 U.S. at 119–21, 107 S.Ct. 2739 (explaining that the *Mattox* rule is based on "[s]ubstantial policy considerations" such as the finality of verdicts and the very existence of the jury system). Hence, a showing that the state court decision was an unreasonable application of the *Mattox* rule is alone insufficient to support the granting of habeas relief. *Cf. Middleton v. Cupp,* 768 F.2d 1083, 1085–86 (9th Cir.1985) (holding that admission of testimony concerning polygraph violation—although arguably in violation of policy underlying federal rules of evidence—did not amount to constitutional error cognizable in federal habeas proceedings).

6. We also note in this regard that, contrary to the state courts' practice and the district court's surmise about New York law based on this practice, New York appears to follow the rule recognized in *Mattox* and embodied in Rule 606(b). *See Sharrow v. Dick Corp.,* 86 N.Y.2d 54, 60–61, 629 N.Y.S.2d 980, 653 N.E.2d 1150 (1995) ("In considering the pro-

priety of any posttrial inquiry into the validity of a verdict or indictment, the majority of jurisdictions have adopted, either by statute or in case law, the rule embodied in rule 606(b) of the Federal Rules of Evidence.... Although New York has not adopted a statute similar to rule 606(b), our case law is consonant with its underlying principles.") (citing cases). Indeed, it appears that most, if not all jurisdictions apply the *Mattox* rule. *See Gosier v. Welborn,* 175 F.3d 504, 511 (7th Cir. 1999) ("[Rule 606(b) ] applies equally when the verdict was rendered in state court. Rule 606(b) codifies a common law rule disallowing inquiry into a jury's (or juror's) reasoning. *See* Charles Alan Wright & Victor James Gold, 27 Federal Practice and Procedure §§ 6072, 6074 (1990). Every state has a parallel rule. It would be altogether inappropriate for a federal court to entertain the kind of evidence Gosier proffers just because this is a collateral attack, when neither a federal nor a state court allows a verdict to be challenged directly using evidence of this kind.").

that petitioner had "had some trouble with the law." None of the remaining eight jurors, however, reported hearing rumors about petitioner's prior bad acts. Furthermore, when questioned by the trial court after the verdict was rendered, Wolford explained that the rumor was voiced "at one end of the table and discussions were going on, myself and of course Miss Kelly that did hear it felt very strongly it should be brought forth. At that point somebody said it was just a rumor.... I think we both then basically, in discussing, it was never mentioned again what it was, what was said to start the whole damn business going. And I just said I don't care. I got to bring it forth." This evidence supports the reasonable conclusion that as soon as Wolford and Kelly heard the rumors about petitioner's prior bad acts, they proposed that interjection of the rumors should be reported to the judge. This gave rise to a discussion among the jurors about whether such a report was necessary. This discussion appears to be what Wolford is referring to as "the whole damn business." Although discussion of Wolford and Kelly's proposal then ensued and Wolford and Kelly ultimately sent a note about the rumors to the trial court, nothing in the juror's testimony or the note suggests that the actual subject matter of the rumors was a part of that discussion. This appears to be what Wolford meant when he stated that "in discussing, it was never mentioned again what it was, what was said to start the whole damn business going."

Additional support for the conclusion that the jury did not consider the rumors in any meaningful way is provided by the fact that, following the note in question, the jury requested that the entire jury charge be read again. Hence, the jurors again heard that their verdict was to be based solely on the evidence admitted at trial. Furthermore, there was no rush to judgment following the introduction of the

rumors. *See Sassounian*, 230 F.3d at 1110 ("Lengthy deliberations preceding the misconduct and a relatively quick verdict following the misconduct strongly suggest prejudice."). Subsequent to the rumor incident—which occurred on the second of five days of deliberations—the jury deliberated three additional days. During this three-day period, the jury requested readback of the testimony of six different witnesses.

Finally, the prosecution introduced a considerable amount of circumstantial evidence tending to show that petitioner had murdered the victim. As the Appellate Division noted, there was "overwhelming evidence of the defendant's consciousness of guilt," including his lie to the police that he had not been with the victim on the night of the homicide, his attempt to create a false alibi, his altering of his appearance after the homicide, his vacuuming of his car the day after the homicide, and his spontaneous statement to police that "you don't have me good enough." *Loliscio*, 187 A.D.2d at 176, 593 N.Y.S.2d 991. Furthermore, there was evidence the jury could credit that petitioner was uninjured before the homicide but had deep scratches on his arm thereafter. *Id.* And most importantly, there was evidence that the victim had been killed sometime between 12:15 A.M.—the time at which the victim called petitioner's home looking for petitioner, according to petitioner's mother— and 2:30 A .M. The Medical Examiner testified that the victim had died no later than 2:30 A.M.. Taken together with petitioner's ultimate admission that he had sexual intercourse with the victim between 12:15 A.M. and 1:00 A.M.—at which latter time petitioner claimed he had dropped off the victim at a 7–11 store—this timing evidence supported petitioner's guilt. *Id.* Petitioner was left to arguing that some other person (or persons) managed to kill the victim and transport her to the Cove

sometime between 1:00 A.M. and 2:30 A.M. The jury can hardly be faulted for not accepting this defense theory.

In sum, we hold that the Appellate Division, in rejecting petitioner's Sixth Amendment claim, did not unreasonably apply the federal constitutional law clearly established in *Turner* and *Chapman*.[7]

## II. Petitioner's Due Process Claim

Petitioner argues that, assuming *arguendo* that the jury's consideration of the rumors did not violate his Sixth Amendment rights, he is entitled to habeas relief nonetheless because the trial court's post-verdict factual inquiry was constitutionally inadequate under the Due Process Clause of the Fourteenth Amendment.

The state responds that this claim is unripe for review because petitioner asserted it neither in state court nor in the district court. This contention is without merit. Petitioner asserted this claim in his brief to the Appellate Division. Similarly, the claim was asserted both in the habeas petition and at oral argument in the district court. Indeed, the district court expressly noted that "one of the arguments that petitioner has made ... is that the inquiry was not as extensive as it should have been and that much more should have been inquired into." Hence, we turn to the merits.

In essence, petitioner argues that the trial court's handling of the post-verdict factual inquiry was constitutionally defective because petitioner's counsel was not permitted to participate in the inquiry, and because the trial court did not attempt to identify the ultimate source of the rumors. In rejecting this argument, the Appellate Division stated that "[t]he extent to which the parties may participate in questioning the juror, among other things, is left to the

sound discretion of the court." *Loliscio,* 187 A.D.2d at 179, 593 N.Y.S.2d 991 (citing *United States v. Ianniello,* 866 F.2d 540, 544 (2d Cir.1989); *United States v. Calbas,* 821 F.2d 887, 896 (2d Cir.1987)).

■ Petitioner fails to show that this adjudication of his claim was contrary to or involved an unreasonable application of clearly established Supreme Court precedent because he fails to identify a clearly established Supreme Court precedent that bears on his claim. *See Williams,* 529 U.S. at 390, 120 S.Ct. 1495 ("The threshold question ... is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final.").

■ In any event, as the Appellate Division accurately noted, the scope of such a post-verdict inquiry, and the extent, if any, to which the parties may participate therein are matters left to the sound discretion of the trial court. *See United States v. Ianniello,* 866 F.2d 540, 544 (2d Cir.1989) ("We leave it to the district court's discretion to decide the extent to which the parties may participate in questioning the witnesses, and whether to hold the hearing in camera.... The three jurors who have already come forward with affidavits, as well as the marshal, should ... be called to testify. The rest of the jurors, however, should be examined only if the district court conducting the hearing determines, in its discretion, that such testimony is needed.") (internal citation omitted); *United States v. Calbas,* 821 F.2d 887, 896 (2d Cir.1987) ("[W]e find no substance in [petitioner's] suggestion that the district court acted improperly in conducting a limited inquiry and in failing to allow counsel to participate in the questioning of jurors.... [T]he trial court has wide discretion in

---

7. Alternatively, we hold that petitioner has failed to establish that the rumors had a substantial and injurious effect on the verdict as required by *Brecht*.

deciding how to pursue an inquiry into the effects of extra-record information, and indeed has the power and the duty to supervise and closely control such inquiries.") (internal citation and quotation marks omitted). We do not think that the trial court abused its discretion in this regard.

## II. Ineffective Assistance

 A criminal defendant's right to effective assistance of counsel derives from the Sixth Amendment right to counsel. *See Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) ("It has long been recognized that the right to counsel is the right to the effective assistance of counsel."). "In a petition for habeas relief alleging ineffective counsel, the question as to whether the matter is governed by existing Supreme Court precedent 'is easily answered because the merits of [such] claim[s] are squarely governed by [the Supreme Court's] holding in *Strickland v. Washington.*'" *Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001) (quoting *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). To establish ineffectiveness under *Strickland,* the defendant must show (1) "that counsel's performance was deficient," i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

To show deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. In determining whether the defendant has made this showing, the court's scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689, 104 S.Ct. 2052 (internal citation and quotation marks omitted).

To establish prejudice, the defendant is required to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt.... On the other hand, 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Lindstadt,* 239 F.3d at 204 (internal citations and quotation marks omitted) (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052).

Applying New York's ineffective assistance law, under which "[e]ffective assistance of counsel is satisfied so long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation," *People v. Wiggins,* 89 N.Y.2d 872, 873, 653 N.Y.S.2d 91, 675 N.E.2d 845

(1996) (internal quotation marks omitted), the state court found that defense counsel provided meaningful representation. Because this standard "is not 'diametrically different, opposite in character or nature, or mutually opposed' to the standard articulated in *Strickland*," our review of the state court's decision is limited to determining whether the state court unreasonably applied *Strickland*. *Lindstadt*, 239 F.3d at 198 (quoting *Williams*, 529 U.S. at 405, 120 S.Ct. 1495).

Petitioner contends that he was deprived of effective assistance of counsel by his trial counsel's: (1) failure to have the victim's brassiere tested for salinity content, and (2) decision to elicit testimony regarding petitioner's jailhouse confession. We find that the state court's rejection of both of these ineffective assistance claims did not constitute an unreasonable application of *Strickland*.

## A. The Salinity Test

During his summation, defense counsel argued that the prosecution's theory that the victim's body had been submerged in sea water was inconsistent with the fact that the victim's brassiere showed no signs of having been submerged in salt water:

> Nothing was done in this particular case to test any of the items for salt. Nothing. Yesterday I had occasion to go upstairs to the vault to take a look at some of the evidence in this particular case. This is the brassiere that was introduced into evidence. You look at it. Did you ever go to the beach, come out of the water, your bathing suit dries. You look at it. Use your good common sense and you decide. We know it hasn't been washed or anything like that.

Trial counsel, however, did not have the brassiere scientifically tested for salinity content. With respect to petitioner's claim that this failure deprived him of effective

assistance, the County Court held that petitioner had failed to meet his burden of "show[ing] that he was deprived of a fair trial by [trial counsel's provision of] less than meaningful representation." The County Court reasoned that, given the Appellate Division's ruling that "the evidence presented during the trial ... was sufficient to support the conviction of intentional murder," and given "trial counsel's diligent and vigorous defense of his client, the exhaustive cross-examination, presentation of defense witnesses and his opening and closing statements which were consistent with a professional, meaningful representation," it would "not indulge in speculation as to the reasons defense counsel chose not to bring [the salinity test] forward when the opportunity was presented." (Citing *Loliscio*, 187 A.D.2d 172, 593 N.Y.S.2d 991.)

When asked during the district court hearing whether he was aware that tests existed to determine the salinity of a garment, defense counsel responded: "In general. I *assumed* that such tests could be performed." (Emphasis added.) When asked why he did not have the brassiere tested for salinity content, defense counsel testified as follows:

> I did not, Judge, consider doing this test. I had tested all of the prosecution's other evidence. I had sent out the DNA evidence to a separate lab to have it tested.... [W]hen I began to cross-examine the [prosecution's] lab people, that was when the idea germinated in my head that they did not perform any salinity tests. I looked at that bra and I could see in my view that it didn't look like it had been submerged. I thought it was almost self-evident that this bra was not in any kind of salt solution. It wasn't stiff. It was soft. It just seemed to me almost a given that this bra was not in salt. If you just took the time to look at it, touch it and smell it. That's

what I relied on, and I argued that to the jury in summation and I invited them to do the same thing, and that's why I moved the bra into evidence.

Citing cases purportedly holding that "the failure of a defense attorney to have scientific tests performed relevant to the issue of guilt or innocence of their client constitutes ineffective assistance," petitioner argues that defense counsel's failure to have the salinity test performed was likewise objectively unreasonable.

We disagree for the following reasons. First, the cases relied upon by the petitioner involve types of "testing" far more standard and obvious than *scientific* testing of clothing for salinity content. *See, e.g., Tucker v. Prelesnik,* 181 F.3d 747, 756–57 (6th Cir.1999) (failure to obtain medical records), *abrogated on other grounds, Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Baylor v. Estelle,* 94 F.3d 1321, 1324–25 (9th Cir.1996) (failure of defense counsel to follow up on exculpatory report regarding defendant's semen samples); *Sparman v. Edwards,* 26 F.Supp.2d 450, 452–53 (E.D.N.Y.1997) (failure to introduce evidence based on medical examinations that had been performed on the victims in sodomy case), *aff'd,* 154 F.3d 51 (2d Cir.1998).[8] Second, testing of the salinity content of clothing is not a commonly recognized or standard type of test admitted in New York criminal trials. As the state points out in this regard, and petitioner does not dispute, no reported New York criminal decision has discussed the admissibility of such salinity testing.

▮ In sum, making "every effort . . . to eliminate the distorting effects of hindsight," and "evaluat[ing] [counsel's] conduct from counsel's perspective at the time," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, we cannot say that counsel's failure to request the salinity test was objectively unreasonable. Indeed, precisely because the use of salinity testing appears to be uncommon in New York criminal trials, defense counsel's strategy of calling to the jury's attention the prosecution's failure to employ such testing and inviting the jury to examine the brassiere for themselves for evidence of salt content can be characterized as effective assistance. *Cf. United States v. Tarricone,* 21 F.3d 474, 476 (2d Cir.1993) (holding that trial counsel's failure to call handwriting expert did not constitute ineffective assistance because he "could reasonably have concluded that the jury could, on its own, recognize that the handwriting on the throughput agreement was not (defendant's")).

## B. The Confession

During defense counsel's cross-examination of the lead police investigator, Detective White, counsel elicited testimony that White had been told by a jailhouse informant that petitioner had confessed to killing the victim to the informant and that White had given the informant a lie detector test. When defense counsel then asked whether the informant had failed the lie detector test, the trial court sustained the prosecution's objection to the question. The prosecution had not previously placed into evidence the existence of the confession. Furthermore, counsel believed that the prosecution did not intend to offer any evidence of the confession.

The County Court held that, with respect to his ineffective assistance claim based on the confession, petitioner had

---

**8.** Petitioner's citation to *Dorsey v. Kelly,* 112 F.3d 50, 52–53 (2d Cir.1997), is unavailing because *Dorsey* did not reach the merits of the petitioner's claim that trial counsel failed to introduce results of scientific tests on semen. We also note that two of the seven cases cited by petitioner are unpublished dispositions.

failed to meet his burden of "show[ing] that he was deprived of a fair trial by [trial counsel's provision of] less than meaningful representation." Citing *People v. Satterfield,* 66 N.Y.2d 796, 497 N.Y.S.2d 903, 488 N.E.2d 834 (1985) and *People v. Baldi,* 54 N.Y.2d 137, 444 N.Y.S.2d 893, 429 N.E.2d 400 (1981), the court reasoned that, "[t]o go behind the record to question or to second guess counsel[']s inquiries into an alleged jailhouse confession is inappropriate where the totality of the evidence at trial was such that the outcome of the criminal action was not compromised." Similarly, the court stated that, "[w]ithout repeating the ... theories of trial strategy which the People offer [in explanation of trial counsel's decision with respect to the confession], suffice it to say that second guessing or having differences of opinion in trial strategy does not amount to an ineffective assistance of counsel."

At the district court hearing on this ineffective assistance claim, defense counsel testified that his strategy in eliciting the testimony about the confession and the failed lie detector test was as follows:

> [I was] try[ing] to show the jury the thinness and the weakness of the prosecution's case against my client and ... that Detective White's state of mind was to try to uncover as much negative information about my client and that he was unsuccessful in doing so. Basically I was trying to show that his state was that he believed that the case against Loliscio was weak and therefore he was trying to buttress it and get some evidence of a type of a jailhouse snitch and his attempts to try to verify or investigate this confession failed miserably.

The district court concluded that defense counsel implemented a sound trial strategy and thus that his performance in this regard was not objectively unreasonable.

 We disagree with the state court's determination (and the district court's concurrence therewith) that trial counsel's decision to elicit testimony about the confession constituted a reasonable trial strategy. To be sure, "in case after case, we have declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." *Tippins v. Walker,* 77 F.3d 682, 686 (2d Cir.1996) (citing cases). Defense counsel's purported strategy here, however, was simply incoherent. As noted, his stated strategy was to get the jury to infer from (1) the fact that Detective White had resorted to attempting to get a confession from Loliscio by way of a jailhouse informant that (2) Detective White believed that the case against Loliscio was very weak. Yet defense counsel admitted that he knew that the confession information had been volunteered by the informant to Detective White, and, therefore, that Detective White had not attempted to secure the confession. Defense counsel conceded that, by eliciting White's testimony in this regard, he succeeded only in showing that Detective White attempted to verify the information that was brought to his attention by giving the informant a lie detector test, and that the prosecution, upon the informant's failing of that test, had elected not to bring the confession to the jury's attention. Such a showing cannot plausibly be viewed as favorable to the defense. We find, therefore, that trial counsel's performance was objectively unreasonable, and thus that the state court's determination to the contrary constituted an unreasonable application of the first prong of *Strickland.*

We therefore turn to the question of whether petitioner was prejudiced by trial counsel's objectively unreasonable performance in this regard. The district court found that petitioner was not prejudiced by the testimony about petitioner's jailhouse confession because the prosecution

expressly declined to rely on the confession during its summation.[9] We agree that this prosecution decision strongly suggests that petitioner was not prejudiced by the confession testimony. Further support for this conclusion is provided by the considerable amount of circumstantial evidence of petitioner's guilt presented at trial. *See supra* section I.

We conclude, therefore, that the state court's determination that trial counsel provided effective assistance was not an unreasonable application of *Strickland.*

## CONCLUSION

For the reasons discussed, the judgment of the district court denying the petition for a writ of habeas corpus is affirmed.

9. The prosecution argued as follows: "I submit to you we called credible witnesses in this case. We didn't call—[defense counsel] asked Detective White about jail house snitches. We didn't call jailhouse snitches in this case. We called people to the stand who lived in the community, who saw things, recollected things, were telling you things under oath that they had seen."