Dwayne **HENRY**, Petitioner–Appellant,

v.

Thomas **POOLE**, Superintendent Five Points Correctional Facility and Eliot L. Spitzer, Attorney General of New York, Respondents–Appellees.

Docket No. 03–2884.

United States Court of Appeals, Second Circuit.

Argued: Feb. 17, 2005.

Decided: May 24, 2005.

Reed Smith, New York, New York (Lawrence T. Hausman, The Legal Aid Society, Criminal Appeals Bureau, New York, New York, on the brief), for Petitioner–Appellant.

Donna Aldea, Assistant District Attorney, Kew Gardens, New York (Richard A. Brown, District Attorney for Queens County, John M. Castellano, Assistant District Attorney, Kew Gardens, New York, on the brief), for Respondents–Appellees.

Before: OAKES, KEARSE, and SACK, Circuit Judges.

Judge SACK concurs, in a separate opinion.

KEARSE, Circuit Judge.

Petitioner Dwayne Henry, a New York State ("State") prisoner convicted of robbery, appeals from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge,* denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he received ineffective assistance of counsel when his trial attorney elicited and emphasized an alibi that was clearly given for the wrong day. The district court denied the petition on the ground that the state court's rejection of Henry's ineffective-assistance-of-counsel claim was neither contrary to nor an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, *see* 28 U.S.C. § 2254(d)(1). On appeal, Henry contends that the state court's rejection of his claim constituted an unreasonable application of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (*"Strickland"*). For the reasons that follow, we agree and reverse the judgment; we instruct that a new judgment be entered, ordering that Henry be released unless the State affords him a new trial within 90 days.

## I. BACKGROUND

The present case arises out of the armed robbery of Richard Mitchell, a livery cab driver in Jamaica, Queens, in the early-morning hours of Thursday, August 10, 1995. The only evidence connecting Henry to the crime was his identification by Mitchell.

As testified to at trial, Mitchell complained to the police that, at 12:10 a.m. on August 10, five men robbed him at gunpoint, stealing $130 and his cab. Two of the robbers had been passengers in the cab, one of whom sat in front (the other three robbers approached the cab when it arrived at the requested destination). At trial, Mitchell described the front-seat passenger as a dark-skinned black man, 20–22 years old, 5'9" tall, 160–165 pounds, with a gold tooth, and wearing a striped shirt.

Some three weeks after the robbery of Mitchell, Henry, a black teenager, was arrested in an unrelated case and was placed in a lineup that was viewed by Mitchell. Mitchell selected Henry as the robber who had been the front-seat passenger, and Henry was charged with one count each of first-degree and second-degree robbery.

### A. *Henry's Defense at Trial*

Henry's position at trial, as stated by his attorney Patrick Watts in his opening statement to the jury, was that Mitchell was mistaken in his identification of Henry. Watts told the jury that he would call as a witness Lakesha Person, Henry's girlfriend, who would give Henry an alibi for the time of the robbery, and that the case would turn on the jury's assessments of the credibility of Mitchell and Person.

Watts cross-examined Mitchell thoroughly in an effort to show that his identification of Henry was mistaken, bringing out discrepancies between Mitchell's initial description of the front-seat robber to the police and Henry's actual appearance. Watts introduced the police complaint report reflecting the initial description that Mitchell had given just 20 minutes after the robbery occurred. Although it appears that Mitchell, some two days after the robbery, gave the police a description of the front-seat robber that more closely matched the description he gave at trial, the description given by Mitchell immediately after the robbery was that the front-seat robber was 20 years old, 5'5" tall, and weighed 120 pounds; he had short hair and was wearing a white T-shirt or tank top.

Watts thereafter cross-examined Police Detective Peter Primerano, who arrested Henry on an unrelated matter on August 31, three weeks after the robbery of Mitchell. Primerano had taken Henry's pedigree information: Henry was 18 years old, was 5'9" tall, and weighed 160 pounds. There is no dispute that, when arrested, Henry had no gold tooth; and the photograph taken of him at that time showed him with a full head of hair. Further, according to the police complaint report, Mitchell initially told the police that the front-seat robber was wearing a T-shirt or tank top; Henry, however, had a large tattoo on his chest that Watts argued would have been visible above a tank top, and Mitchell had made no mention of a tattoo.

Before the arrest of Henry, Primerano had not been assigned to the Mitchell robbery case. After arresting Henry, Primerano called Mitchell to view Henry in a lineup, and Mitchell identified Henry as the front-seat robber. Watts introduced a photograph of the lineup to show that Henry was taller than any of the other participants, arguing that the lineup was suggestive. Primerano testified that he did no follow-up investigation in connection with the robbery of Mitchell. He "drew up the case with the Queens District Attorney's office," and "[t]hat was about it." (Tr. 274.)

Although Watts challenged Mitchell's identification of Henry in many respects, there was no question as to the date and time of the robbery of which Henry was accused—August 10 at 12:10 a.m. Mitchell so testified; the police complaint report introduced by Henry so indicated; and the State's bill of particulars, served on Henry in response to his pretrial discovery request, so stated. Nonetheless, when Watts called Person as a witness, instead of asking her about the early morning hours of Thursday, August 10, he asked her only about events on "th[e] night" of August 10:

Q. . . . . On August the 10th 1995, was [Henry] your boyfriend?

A. Yes.

Q. And where was Mr. Henry living at that time?

A. With me . . . .

. . . .

Q. Now, Miss Person, directing your attention . . . to August the 10th, 1995, tell the jurors in your own words, just tell them where you and Mr. Henry were on that date and at approximately around twelve o'clock *that night.*

A. Well, the day started off as usually, get up in the morning, and then early afternoon, like morning to afternoon time, we went to the park with my daughter, me him and my little daughter. And we stayed there for awhile until like it started getting dark like toward the evening time, because the sun was just going down and it was

turning like mid-evening time. Then we went home.

We stayed home for a little while. We were outside for a little while. Then we were supposed to go to the movies, but we wasn't able to go. My mother, she didn't want to watch my daughter for me, so I didn't have no babysitter, so we just stayed in the house *that night.*

Q. Did Dwayne ever leave your sight *that night?*

A. No, he did not. We stayed in.

(Trial Transcript ("Tr.") 283–84 (emphases added).)

Q. . . . [W]hy do you remember August the 10th?

A. Because that was the opening date of the movie ["Virtuosity"] that we were supposed to go see and I just calculated back to what we did and everything, and that's how I came to that conclusion that we was, we went to the park and we were supposed to go to the movies that day.

(*Id.* at 286.) Person also testified that Henry had a prominent tattoo on his chest and that in the four years she had known him, she had never seen him with a gold tooth (*see* Tr. 285–86), even one that was removable jewelry (*see* Tr. 305–07).

The Assistant District Attorney ("ADA"), cross-examining Person, sought—and received—confirmation that Person was giving Henry an alibi only for the afternoon and night of August 10 rather than for the early morning hours:

Q. You're testifying that you were with the defendant on Thursday, August 10th, that's your testimony; right?

A. Yes.

Q. And you're testifying that Thursday, August 10th, that morning or *that day* you went to the park with the defendant, right?

A. *Yes.*

Q. And then you're testifying that *that night* you slept with the defendant and he never left your sight, right?

A. *Yes.*

Q. *So that would be Thursday going into Friday, right?*

A. *Yes.*

Q. Okay. And that was, you testified in the grand jury as well, as you spoke about with Mr. Watts, right?

A. Yes.

Q. *And when you testified in the grand jury, you also were speaking about Thursday night into Friday that you were with the defendant, right?*

A. *Um-hm.*

Q. Okay. . . . *Were you certain of the date when you went into the grand jury?*

A. *Yes, I was certain.*

(Tr. 287–88 (emphases added).)

Q. And you're certain that Virtuosity came out that date. That's your testimony; right?

A. Yeah.

. . . .

Q. And last question, Miss Person, *Thursday night,* August 10th, you were with the defendant and you slept in the same place with the defendant, never lost sight of the defendant until the next morning; right?

A. *Yes.*

(Tr. 305, 308 (emphases added).)

Watts had been given a copy of Person's grand jury testimony, in which the alibi period to which she testified was Thursday night into Friday morning, prior to making his opening statement at trial. On redirect examination, Watts had Person confirm that she had told the grand jury that Henry was with her on August 10 and had her reiterate that he was with her on that

date; and he again made no effort to ask Person whether Henry was with her in the early morning hours of that date. (*See* Tr. 308–11.) On recross-examination, the ADA again elicited that Person, testifying before the grand.jury, had given Henry an "alibi" for the same time period to which she was referring at trial, *i.e.*, for the night, not the early-morning hours, of August 10:

Q. And you testified for ·the defendant as an alibi witness similarly to what you are doing now; right?

A. Yes.

Q. And isn't it a fact that similarly to now you testified in the Grand Jury that *you were with the defendant during the day on Thursday into Friday, right?*

A. *Yes.*

Q. *So that show that you were going to see would have taken you into Friday morning?*

A. *Yes.*

(Tr. 311 (emphases added).)

In the defense summation, Watts began his discussion of the case by reminding the jury of his opening statement that the jury would have to determine whether to believe the identification testimony of Mitchell or the alibi testimony of Person. (*See* Tr. 315–16.) Watts then summarized his cross-examination of Mitchell, principally as to Mitchell's opportunity and ability to observe the robbers, his memory of the front-seat robber's appearance, including the gold tooth, and Mitchell's failure to mention a tattoo. (*See, e.g.*, Tr. 319–24, 329–30.) Watts reminded the jury of the initial description Mitchell had given .the police just 20 minutes after the robbery, a description that Henry did not match in, *inter alia*, height, weight, age, or hair length. (*See, e.g.*, Tr. 319, 328–29, 335–36.)

Watts also repeatedly emphasized the alibi testimony of Person,· whom he de-scribed as having no motive to lie, and he urged the jury to find on the basis of her testimony that the State had failed to prove its case (*see* Tr. 322–23, 325–27, 330–32, 334, 339–40), saying, *inter alia,*

[l]ook at, what L[a]kesha Person is saying. Think about it, ladies and gentlemen. I submit to you, if you do, you will come to the only conclusion possible, and that is that the People have failed to prove my client's guilt beyond a reasonable doubt.

(Tr. 334.)

But Watts acknowledged that the robbery had occurred just after midnight, on "Wednesday going into Thursday" (Tr. 326), and that Person had testified only with respect to "Thursday ... until Friday" (*id.*); and he argued that "[s]he didn't make any mistake about" the date to which she testified (Tr. 339).

[Y]ou heard from Lakesha Person. She didn't have to lie. What motive does she have to come up here and say to you, ladies and gentlemen, yes, he 'was with me. And what did she tell us? She said that he was with me. We were at the movies....

.... *[S]he certainly had a reason to remember August the 10th, 1995....*

And what did. she say? She said August the 10th, it was a Thursday. I don't know what the assistant district attorney would tell you, but *you know what Miss Lakesha said. She said yes, it' was Thursday and I stayed with him until Friday, and he left Friday morning....*

Now, this crime occurred at twelve o'clock, twelve o'clock August the 10th, 1995. Twelve o'clock, August the 10th, 1995 is when it occurred. Now that's going, Thursday, Wednesday going into Thursday. That's what it is. And that's what the assistant district attorney may say to you. Well, she's alibiing

him for the following day, Thursday going into Friday. That's what she's alibiing him for. Not for Wednesday going into Thursday.

Well, she told us, ladies and gentlemen, she sat here and told us at twelve o'clock *that night* where she was going on August the 10th 1995. Where was she then? She was in her home. She was with Mr. Henry. They were going to the movies, and she even mentioned the movie.

. . . .

. . . . Look at the facts, look at the testimony of both parties. Look at all the evidence, because I know the assistant district attorney may claim well, what Miss Person said, *she said it was August the 10th and it was a Thursday to a Friday,* and that's how she knows, and because it was Thursday to Friday then, therefore, she was mistaken with regard to the date and time that these individuals went to the movies.

Ladies and gentlemen, she told you what was going on. She told you what was happening on the time in which she went to what they were doing. She told you about the park. She told you about her daughter. She told you about where they went, where they were.

*She didn't make any mistake about it.* She knew *on that day,* because like she said, they calculated back what was going on. And is that something wrong with doing that? Something wrong with calculating back to what happened at that particular time? He may tell you well hey, she calculated wrong. And then she's coming in and telling you one thing.

She told you what she told the grand jurors. He was with her. He was there *at that time.* That's what she told us.

And that's what it comes down to. Question of belief, ladies and gentlemen. (Tr. 325–26, 339–40 (emphases added).)

The State in summation of course did not argue that Person had miscalculated or was mistaken as to the date on which she and Henry were together, since her testimony did not refer to the time of the robbery. In addition to arguing that the testimony of Mitchell was credible, the ADA argued that Person had an obvious interest in the exoneration of her boyfriend but had simply given Henry an alibi for the wrong day:

Now, the defense, of course, calls an alibi witness. And *everybody is up on the edge of their seat. This is a big thing.* This is where he says he was. Well, very interestingly, *this report which the defense put into evidence* gives us some very important information.

*It says this crime occurred from Wednesday to Thursday,* and that is when I directed Mr. Mitchell's attention to. He said he started work Wednesday at six o'clock and this crime occurred in the early evening, Thursday morning. *This alibi witness was unequivocal.* I wasn't trying to trick her. I asked her specifically, you are testifying that you were with this defendant from Thursday to Friday morning. Ladies and gentlemen, who cares? Is she now, are they now going to say well, they were with each other the night after, so that now counts for Wednesday night into Thursday? That's irrelevant. It means nothing.

(Tr. 349–50 (emphases added).) The ADA reiterated that Henry "is not charged with committing a crime Thursday into Friday. He is accused with committing a crime Wednesday night into Thursday morning," and that Person "came in and testified about the *wrong day.*" (Tr. 350–51 (emphasis added).)

The ADA argued that Henry and Person had concocted the story that they were at home alone because a story that they were together elsewhere might have been vulnerable to disproof, but that in any event, they concocted the alibi for "the wrong night":

> It is very easy to say, for the alibi witness to come in here and say we were alone. We were just alone that night. . . . Because then there is nobody to corroborate. So she corroborates him and he corroborates her. Nobody else saw them. If they went to the movies, there would be ticket stubs possibly, there would be other people who saw them. It is very easy to say we were supposed to do something, we stayed home. That's why they went with that story. And ladies and gentlemen, it was for the wrong night anyway.

(Tr. 355 (emphases added).) The ADA argued that Mitchell, unlike Person, had no interest in the outcome of the case and no motive to lie about his recognition of Henry, and stated,

> I am going to finish up by just reminding you that the defendant presented a witness who is obviously interested. She gave the wrong alibi date.

(Tr. 364 (emphasis added).)

The jury convicted Henry of first- and second-degree robbery. The court sentenced him to concurrent prison terms of 10–20 and 6–12 years.

## B. The State–Court Posttrial Proceedings

Represented by new attorneys, Henry appealed to the Appellate Division, arguing, inter alia, that he had received ineffective assistance of counsel at trial because Watts promised an alibi defense although he knew that the purported alibi witness could not vouch for Henry's whereabouts at the time of the crime, that Watts proceeded to present an alibi defense for the wrong time period, and that he continued to press that defense to the jury even after its flaw was clearly exposed. In People v. Henry, 266 A.D.2d 564, 699 N.Y.S.2d 129 (2d Dep't 1999) ("Henry I"), rev'd, 95 N.Y.2d 563, 721 N.Y.S.2d 577, 744 N.E.2d 112 (2000), the Appellate Division reversed the convictions, notwithstanding counsel's competence in other aspects of the proceedings, and ordered that Henry be given a new trial.

> Defense counsel's questions to the witness focused on the night of August 10, 1995, resulting in testimony concerning the defendant's whereabouts almost 24 hours after the crime had been committed. Inasmuch as the witness' testimony went to the heart of the alibi, counsel's error undermined the defense, . . . . [and] the representation provided was not adequate or effective in any meaningful sense of the words.

Henry I, 266 A.D.2d at 565, 699 N.Y.S.2d at 130 (internal quotation marks omitted).

The State sought and received permission to appeal that decision to the New York Court of Appeals ("NY Court of Appeals"), which reversed the decision of the Appellate Division. See People v. Henry, 95 N.Y.2d 563, 721 N.Y.S.2d 577, 744 N.E.2d 112 (2000) ("Henry II"). The N.Y. Court of Appeals, applying its established standard for claims of ineffective assistance of counsel—a "flexible" standard under which the state court is to consider whether the defendant received "meaningful representation" based on the "totality" of the circumstances of the case, and whether the defendant has shown "prejudice [based] on the fairness of the process as a whole rather than [any] particular impact on the outcome of the case"—concluded that Henry had not received constitutionally ineffective assis-

tance. *Henry II*, 95 N.Y.2d at 565–66, 721 N.Y.S.2d at 578–79, 744 N.E.2d 112 (internal quotation marks omitted). The court stated, in part, as follows:

At trial, defense counsel presented two defenses. Counsel challenged the reliability of the identification and also presented an alibi witness who testified that she was with defendant at midnight on August 10, 1995. *On cross-examination, however, the witness acknowledged her Grand Jury testimony that she knew of defendant's whereabouts only during the night of August 10 and early morning hours of August 11. She could not account for defendant's whereabouts in the early morning hours of August 10.* On summation, defense counsel attacked the victim's credibility and argued that the victim mistakenly identified his client as the perpetrator. As for the alibi witness's testimony, *counsel maintained that the discrepancy was one for the jury to resolve.* In response, the prosecutor argued that because the witness provided an alibi for the wrong date, her testimony should be disregarded.

. . . .

In evaluating ineffective assistance of counsel claims, *this Court has consistently applied a "flexible" approach* (*People v. Benevento*, 91 N.Y.2d 708, 712, 674 N.Y.S.2d 629, 697 N.E.2d 584). "So long as the evidence, the law, and the circumstances of a particular case, *viewed in totality* and as of the time of the representation, reveal that the attorney provided *meaningful representation*," a defendant's constitutional right to the effective assistance of counsel will have been met (*People v. Baldi*, 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400). *Thus, the standard in New York has long been whether the defendant was afforded "meaningful representation"* (*see, People v. Beneven-*

*to, supra,* 91 N.Y.2d, at 712, 674 N.Y.S.2d 629, 697 N.E.2d 584; *People v. Flores*, 84 N.Y.2d 184, 187, 615 N.Y.S.2d 662, 639 N.E.2d 19; *People v. Claudio*, 83 N.Y.2d 76, 79–80, 607 N.Y.S.2d 912, 629 N.E.2d 384, *rearg. dismissed* 88 N.Y.2d 1007, 649 N.Y.S.2d 373, 672 N.E.2d 598).

In applying this standard, courts should not confuse true ineffectiveness with losing trial tactics or unsuccessful attempts to advance the best possible defense. The Constitution guarantees a defendant a fair trial, not a perfect one (*Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674). *Isolated errors in counsel's representation generally will not rise to the level of ineffectiveness, unless the error is "so serious that defendant did not receive a 'fair trial'"* (*People v. Flores, supra,* 84 N.Y.2d, at 188–189, 615 N.Y.S.2d 662, 639 N.E.2d 19).

*Henry II*, 95 N.Y.2d at 565–66, 721 N.Y.S.2d at 578, 744 N.E.2d 112. The N.Y. Court of Appeals noted that there are differences between its standard of ineffectiveness and the federal standard. It described the federal standard as follows:

The Federal test for evaluating ineffective assistance of counsel claims is set forth in *Strickland v. Washington* (466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674). To overcome the presumption of effective representation, a defendant must demonstrate that (1) the attorney's performance was deficient, and (2) but for counsel's unprofessional errors, there is a "reasonable probability" that the outcome of the proceedings would have been different (*id.*, at 687, 694, 104 S.Ct. 2052). The United States Supreme Court has held that the "touchstone" of the second prong of the analysis is whether counsel's performance rendered the proceeding fundamentally

unfair or left an unreliable result (see, *Lockhart v. Fretwell*, 506 U.S. 364, 369–370, 113 S.Ct. 838, 122 L.Ed.2d 180). *Henry II*, 95 N.Y.2d at 566 n. *, 721 N.Y.S.2d at 579 n. *. The N.Y. Court of Appeals rejected a request by the State that the federal standard be adopted in lieu of the New York standard:

Despite our well-settled test for evaluating ineffective assistance of counsel claims, the People ask this Court to adopt the Federal standard, maintaining that it is more precise than the State's "meaningful representation" standard. *This Court has previously recognized the differences between the Federal and State tests for ineffectiveness, and has consistently adhered to the application of our "meaningful representation" test* (see, *People v. Benevento, supra,* 91 N.Y.2d, at 713–714, 674 N.Y.S.2d 629, 697 N.E.2d 584; *People v. Claudio, supra,* 83 N.Y.2d, at 79–80, 607 N.Y.S.2d 912, 629 N.E.2d 384). *In doing so, we have clarified "meaningful representation" to include a prejudice component which focuses on the "fairness of the process as a whole rather than [any] particular impact on the outcome of the case"* (*People v. Benevento, supra,* 91 N.Y.2d, at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584). No further clarification of the standard is required.

*Applying that standard here,* we conclude that defendant received meaningful representation. Although the prosecution discredited the alibi testimony, *this alone did not "seriously compromise" defendant's right to a fair trial* (see, *People v. Hobot,* 84 N.Y.2d 1021, 1022, 622 N.Y.S.2d 675, 646 N.E.2d 1102). *Counsel competently represented defendant's interests at other stages of the proceedings, and counsel's presentation of the alibi testimony did not diminish the legitimacy of defendant's*

*misidentification defense.* Indeed, the thrust of *the defense was misidentification, which was, in part, buttressed by the alibi witness's testimony.* Counsel further supported that defense by vigorously attacking the reliability of the victim's identification and highlighting the discrepancies in the victim's description of defendant. In view of the extensive misidentification defense and *counsel's competency in all other respects,* we conclude that *counsel's failed attempt to establish an alibi was at most an unsuccessful tactic* that cannot be characterized as ineffective assistance (see, *People v. Jackson,* 52 N.Y.2d 1027, 1029, 438 N.Y.S.2d 299, 420 N.E.2d 97).

*Henry II,* 95 N.Y.2d at 566, 721 N.Y.S.2d at 578–79, 744 N.E.2d 112 (footnote omitted) (emphases added). The N.Y. Court of Appeals accordingly remanded to the Appellate Division for resolution of any remaining issues. On remand, the Appellate Division affirmed Henry's convictions. *See People v. Henry,* 281 A.D.2d 490, 721 N.Y.S.2d 793 (2d Dep't 2001).

Henry then moved in the state trial court pursuant to N.Y.Crim. Proc. Law § 440.10(1)(h) to vacate his convictions on the basis of evidence, beyond the trial record, as to whether trial counsel's introduction of the fallacious alibi evidence was the result of strategy rather than error. Henry submitted an affidavit from Watts in which Watts denied having intentionally introduced the irrelevant alibi testimony as a "tactic," stating that his use of Person as an alibi witness was simply an honest mistake:

5. In the course of appellate litigation in this case, the People have argued that, as a matter of trial strategy, I called or might have called Ms. Person in a deliberate attempt to deceive the jury into adopting an irrelevant alibi, knowing that Ms. Person could not alibi

[Henry] for the night of the crime. According to the People this would have been a legitimate trial strategy since, if the discrepancy went unnoticed the jury would adopt the irrelevant alibi and acquit and, if the irrelevance of the alibi was exposed the defense would be no worse off than if it had presented no alibi at all.

6. In over twenty years of practice as a prosecutor and defense lawyer, I have never employed those or any similar trial tactics. To have called Ms. Person in a deliberate attempt to persuade the jury to adopt an irrelevant alibi would, I believe, have been unethical. In addition, I do not accept that it could ever make strategic sense to jeopardize a strong case by knowingly presenting an irrelevant alibi to a jury.

7. *My reason for calling Ms. Person as an alibi witness in this case was my belief that she knew Mr. Henry's whereabouts at the time of the crime.* From her trial testimony it now appears that Ms. Person was confused either about the night on which she and Mr. Henry had planned to go to the movies or about the night on which the crime was alleged to have occurred. In either case, it was an honest mistake. *If I had believed that Ms. Person was unable to account for Mr. Henry's whereabouts at the time of the crime, I would not have called her as an alibi witness.*

(Affidavit of Patrick Watts dated February 11, 2002 ("Watts Aff."), ¶¶ 5–7 (emphases added)).

The State opposed the § 440.10 motion, contending, *inter alia,* that it was procedurally barred because the issues raised either were decided on the merits during Henry's direct appeal or were not raised on direct appeal and should have been. The State argued that the Watts Affidavit was irrelevant in part because Henry had argued before the Appellate Division that "the record *conclusively* demonstrated that 'defense counsel ... had *actual knowledge* before trial that defendant's alibi witness could not vouch for appellant's whereabouts at the time of the robbery" ' (State's Affirmation in Opposition to Motion To Vacate Judgment at 7 (quoting Henry's brief to the Appellate Division at 22) (emphases in originals)). The State also argued that Watts's affidavit was irrelevant because the N.Y. Court of Appeals had not decided that the fallacious alibi was not the result of attorney error; rather, the State argued, the Court of Appeals had decided simply that counsel's error did not cause Henry prejudice. Finally, the State argued that the motion was meritless because Henry's claim amounted to nothing more than his disagreement with counsel's strategy and that, in any event, that strategy was not harmful.

In a decision dated March 26, 2002, the state trial court agreed with the State's interpretation of the N.Y. Court of Appeals decision and ruled that Henry's ineffective-assistance-of-counsel claim was procedurally barred because "the issue raised herein was previously determined upon the appeal ...." *People v. Henry,* Ind. No. 4062/95 (Sup.Ct. Queens County, Mar. 26, 2002) (*"Henry III"*). Leave to appeal that decision to the Appellate Division was denied.

## C. *The Decision of the District Court in the Present Proceeding*

Having exhausted his state-court remedies, Henry filed his present habeas petition, pursuing the ineffective-assistance-of-counsel claim he had asserted in his direct appeals and his § 440.10 motion. Henry argued that he had been

denied the effective assistance of counsel where his trial lawyer promised an alibi

defense, proceeded to elicit an alibi for the night *after* the crime, and continued to press this fallacious defense on the jury even after the prosecution had exposed its irrelevance, thereby fatally undermining what was otherwise a potentially powerful misidentification defense, and where the prosecution capitalized on these errors by ridiculing counsel's reliance on the fallacious alibi, arguing that the alibi witness had lied to the jury and suggesting that she was so unreliable that she could not even concoct an alibi for the correct night.

(Petitioner's Memorandum of Law in Support of Petition for Habeas Corpus at 9 (emphasis in original)). Henry argued that "[d]efense counsel's reliance on the alibi defense was a colossal blunder, it destroyed an otherwise strong defense, and it is, therefore, overwhelmingly likely that it cost [Henry] a sound chance at acquittal." (*Id.* at 37.)

The district court denied the petition in a Memorandum, Judgment & Order dated October 8, 2003 ("District Court Opinion" or "*Henry IV*"). The court observed that since the N.Y. Court of Appeals had rejected Henry's ineffective-assistance-of-counsel claim on its merits, federal habeas corpus relief could not be granted on that claim unless the state court decision was contrary to, or involved an objectively unreasonable application of, clearly established federal law, as announced by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence, *see* 28 U.S.C. §§ 2254(d)(1) and (2). District Court Opinion at 9–10, 25.

Noting that a defendant's Sixth Amendment "right to counsel is the right to *effective* assistance of counsel," District Court Opinion at 18 (internal quotation marks omitted) (emphasis in District Court Opinion), the court described the standard set by the United States Supreme Court in *Strickland.* It noted the "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,'" *id.* at 20 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052), and the general rule that "strategic choices made by counsel after a thorough investigation of facts and law [to the extent reasonably necessary to the defense] are 'virtually unchallengeable,'" District Court Opinion at 20 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

Although the court found that "[t]he prosecutor capitalized on counsel's reliance on this fallacious defense" by, *inter alia,* "argu[ing] that the alibi was fabricated and suggest[ing] that the fact that Person had testified about the wrong day was evidence of the fabrication," District Court Opinion at 3, the court concluded that the N.Y. Court of Appeals decision in *Henry II* was not an unreasonable application of the *Strickland* standard.

Considering counsel's representation as a whole, the New York Court reasonably concluded that counsel provided petitioner with effective representation. In this regard, the record reveals that counsel zealously and effectively represented petitioner at every stage of the proceedings. Before trial, counsel moved to suppress the victim's identification testimony, extensively cross-examined the State's police witness, and argued that the line-up was unduly suggestive .... At trial, counsel strenuously objected to the prosecution's ... applications [to introduce evidence of Henry's prior convictions] ..., conducted a competent voir dire ..., and delivered an effective opening statement, in which he raised a strong misidentification defense and emphasized the prosecution's burden of proof .... Throughout the course of the trial, counsel

raised numerous objections to the prosecutor's questions and arguments, many of which were sustained. He also conducted extensive cross-examination of the State's witnesses, efficiently attacking the victim's credibility by eliciting testimony that he had a suspended license and a misdemeanor conviction ....

Counsel presented four exhibits to support his misidentification defense, including the complaint report, which revealed discrepancies between the victim's initial description of petitioner and his actual appearance, and the arrest photograph, which showed that although Mitchell had described petitioner as having short, wavy hair, petitioner had a full head of hair at the time of the arrest .... Counsel also republished the lineup photo to the jury, arguing that the lineup was suggestive because petitioner was taller than the five fillers .... Counsel presented a defense witness— Lakesha Person, not only to attempt to offer an alibi for petitioner, but also to support the misidentification defense. In this vein, counsel elicited that petitioner had a large tattoo on his chest, which had not been described by the victim .... Counsel also elicited that in the four years that she had know[n] petitioner, Person never saw him wear a gold tooth in his mouth—a characteristic that the victim had mentioned in this description of the robber ....

During his summation, counsel presented a cohesive summary of the evidence supporting the misidentification defense. He persuasively argued that Mr. Mitchell's description of the perpetrator did not match petitioner's appearance, and specifically highlighted the differences between Mitchell's description and petitioner's pedigree information .... He also referred to Person's testimony that petitioner did not have a gold tooth, and that he had a large tattoo on his chest, arguing that these factors also supported the conclusion that petitioner was not the perpetrator .... Counsel emphasized that the eyewitness neighbor who had called the police was never questioned, and did not testify at trial, thus implying that there was a gap in the State's evidence ....

Counsel also objected to portions of the court's charge and, after the verdict, argued for a lenient sentence, citing petitioner's youth and family background as mitigating factors .... Then, after sentence was imposed, counsel requested that petitioner receive credit for the time he had already served .... Thus, viewed in its totality, the record demonstrates that counsel zealously, thoroughly, and effectively represented petitioner throughout the trial.

There is no possibility that, absent counsel's decision to elicit the alibi testimony, the outcome of petitioner's trial would have been different.

District Court Opinion at 28–30. The court denied the petition for habeas but granted Henry a certificate of appealability, finding that he "ha[d] made a substantial showing of the possible denial of a constitutional right." *Id.* at 30.

## II. DISCUSSION

On appeal, Henry contends that the district court should have granted his habeas petition because the state court's holding in *Henry II* that he had not been denied constitutionally effective assistance of counsel constituted an unreasonable application of the Supreme Court's standard established in *Strickland*. For the reasons that follow, we agree.

A. *The* Strickland *Standard and the Merits of Henry's Claim*

In *Strickland,* the Supreme Court established a two-pronged test for deter-

mining whether a defendant's Sixth Amendment right to the effective assistance of counsel had been violated. In order to prove such a violation, a convicted defendant must show both (a) "that counsel's representation fell below an objective standard of reasonableness .... under prevailing professional norms," 466 U.S. at 688, 104 S.Ct. 2052, and (b) "that the deficient performance prejudiced the defense," *i.e.*, "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, 104 S.Ct. 2052. The *Strickland* Court elaborated on the contours of each prong.

■■■ In considering the quality-of-representation prong, *i.e.*, whether counsel's performance fell below an objective standard of reasonableness, a court must bear in mind both that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process," *id.* at 688, 104 S.Ct. 2052, and that counsel must have "wide latitude" in making tactical decisions, *id.* at 689, 104 S.Ct. 2052. Thus, the court must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. 2052. Actions or omissions by counsel that " 'might be considered sound trial strategy' " do not constitute ineffective assistance. *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052; and even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary, *id.* at 690–91, 104 S.Ct. 2052.

■■■ The "prejudice" prong of the *Strickland* test requires the court to determine whether, but for counsel's deficient performance, "there is a reasonable probability that ... the result of the proceeding would have been different," 466 U.S. at 694, 104 S.Ct. 2052, for an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment," *id.* at 691, 104 S.Ct. 2052. Indeed, the defendant must show more than that the unprofessional performance merely "had some conceivable effect," *id.* at 693, 104 S.Ct. 2052. To satisfy the "reasonable probability" test, however, "a defendant *need not show* that counsel's deficient conduct *more likely than not* altered the outcome in the case," *id.* (emphases added). The purpose of the Sixth Amendment guarantee of "the Assistance of Counsel," U.S. Const. Amend. VI, is to ensure that defendants have " 'effective' " assistance of counsel, *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)), that is, "the assistance necessary to *justify reliance on the outcome of the proceeding*," *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052 (emphasis added). Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. "[T]he question to be asked in assessing the prejudice from counsel's errors .... is whether there is a reasonable probability that, absent the errors, the

factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.... Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, *a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.*

*Id.* at 695–96, 104 S.Ct. 2052 (emphasis added).

 In sum, "[a] reasonable probability" that the outcome of the proceeding would have been different but for counsel's professionally unreasonable performance "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance* of the evidence to have determined the outcome." *Id.* (emphasis added).

 Applying these standards to the present case, we conclude that both prongs of the *Strickland* test are met. The defect in Henry's trial attorney's representation was the elicitation of an alibi for the wrong date—an error that plainly "went to the heart of the alibi," and "undermined the defense," *People v. Long,* 81 A.D.2d 521, 521–22, 438 N.Y.S.2d 1, 2 (1st Dep't 1981) ("The questions of defendant's attorney were keyed to the *evening* of July 22, thus prompting the alibi witnesses to testify to defendant's whereabouts 24 hours after the [1:40 *a.m.,* July 22] crime." (emphases added)). Further, Watts adhered to the alibi defense and urged the jury to accept it throughout the trial—long after it must have been clear to the jury beyond peradventure that Person provided Henry with an alibi only for the night after the night of the crime.

Clarity as to the fact that Person could provide Henry with an alibi only for the wrong date is hardly a matter of hindsight. Although Watts stated in his affidavit that in his investigation he had interviewed Person about Henry's whereabouts "on the night of the crime" and had been told that Henry was with her "that night" (Watts Aff. ¶ 2), and stated that "it *now* appears" that Person was confused (*id.* ¶ 7 (emphasis added)), Watts could not have made a reasonable investigation because he indisputably possessed all of the pertinent information as to the mismatch of time periods prior to asking Person a single question, and indeed prior to making his opening statement. There plainly was no question as to the date or time of the robbery with which Henry was charged; the indictment, as well as the police complaint report given to Henry in pretrial discovery, specified that the robbery took place on August 10 in the early morning hours. The State also had given Watts Person's grand jury testimony, in which Person had been able to give Henry an alibi only for the night of August 10, *i.e.,* 24 hours after the robbery. Nonetheless, Watts in his opening statement promised to substantiate the defense of misidentification by presenting the testimony of Person, who would provide Henry with an alibi for the time of the crime. Watts then proceeded to question Person only as to "th[e] night" of August 10, not as to the early-morning hours when the crime was committed. The failure to recognize the difference between the beginning and the end of the day plainly falls below any

acceptable level of professional competence.

Further, even after the ADA's cross-examination highlighted that Person, in testifying that Henry had been with her on "th[e] night" of August 10, was providing Henry with an alibi only for "Thursday night into Friday," Watts unaccountably persisted with the purported alibi defense. He acknowledged in his summation that the robbery occurred on "Wednesday going into Thursday" (Tr. 326) and that Person had testified only as to "Thursday going into Friday" (*id.*); and he said that Person "didn't make any mistake about" the date on which Henry was with her (Tr. 339); she had carefully calculated the precise alibi date by reference to a verifiable external event (*see id.* at 325). Mystifyingly, Watts told the jury that the ADA would argue that Person was mistaken as to the date on which she and Henry were claimed to have been together. Equally inexplicably, in light of his acknowledgement that the robbery occurred on Wednesday night and that the alibi was for Thursday night, Watts ended his summation by telling the jury that its decision would boil down to whether it believed Person or Mitchell. The failure to recognize that Person's alibi testimony in no way contradicted the testimony of Mitchell—because they dealt with Henry's whereabouts on different nights—is not within the realm of professional competence.

The State contends that Watts's presentation of the false alibi defense should not be considered ineffective assistance because the defense was either forced upon Watts by Henry or was a stratagem employed by Watts in the hope that the mismatch of dates would escape notice by the jury. We reject both hypotheses. The former contention is apparently conjecture, as the State has not provided us with any record excerpt or citation indicating that Watts presented the phony alibi defense at Henry's insistence.

 Nor can we accept the State's alternative contention that Watts's presentation of an alibi for the wrong date was simply a tactic, for it is generally acknowledged that an "attempt to create a false alibi" constitutes " 'evidence of the defendant's consciousness of guilt.' " *Loliscio v. Goord*, 263 F.3d 178, 190 (2d Cir.2001) (quoting *People v. Loliscio*, 187 A.D.2d 172, 176, 593 N.Y.S.2d 991, 994 (2d Dep't 1993)); *see, e.g.,* 2 F. Bailey & K. Fishman, *Criminal Trial Techniques* § 32:21 (2002) ("Maintaining false alibis to meet a false charge is the way many defendants end up in prison. If the prosecution can establish the falsity of an alibi ..., your case is as good as lost. Many jurors regard a false alibi as an admission of guilt."); 2 G. Schultz, *Proving Criminal Defenses* ¶ 6.08 (1991) ("[T]here is nothing as dangerous as a poorly investigated alibi. An attorney who is not thoroughly prepared does a disservice to his client and runs the risk of having his client convicted even where the prosecution's case is weak. A poorly prepared alibi is worse than no alibi at all."); *see generally United States v. Parness*, 503 F.2d 430, 438 (2d Cir.1974) ("It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force."), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

In sum, we recognize that counsel has wide leeway to adopt tactical positions; but counsel's lack of recognition that Person presented an alibi for the wrong night, and his presentation, adherence to, and emphasis on that evidence although it had no tendency to show Henry's innocence and was instead a type of evidence that is commonly accepted as evidence of a defen-

dant's consciousness of guilt, was representation that fell far below an objectively acceptable level of professional competence.

As to the prejudice prong of *Strickland*, we cannot conclude that there is no reasonable probability that the presentation of the false alibi defense affected the outcome of Henry's trial. There was no evidence that Henry had been targeted as a suspect in the robbery of Mitchell as a result of investigative police work—either before or after Mitchell picked him out of a lineup. Although on the night of the robbery, the police and Mitchell drove around the neighborhood looking for the robbers, they had no success. The evidence at trial was simply that Henry was arrested three weeks later on an unrelated charge by a detective not assigned to the Mitchell robbery case; Henry was identified by Mitchell from a lineup that Watts was able to argue was suggestive because the lineup photograph showed that Henry was taller than the other participants; and Primerano, the arresting detective, testified that after Mitchell picked Henry out of that lineup, Primerano simply "drew up the case" with the District Attorney's office, and "[t]hat was about it" (Tr. 274).

Thus, the only evidence presented to the jury to connect Henry to the robbery of Mitchell was Mitchell's identification testimony. And as the State argues on this appeal, Henry had a "strong" defense of misidentification. (State brief on appeal at 21.) Watts's presentation of photographic and documentary evidence and his cross-examinations of Mitchell and Primerano in an attempt to show that Mitchell's identification of Henry was mistaken, were efforts well spent, as he showed that "there were numerous discrepancies between the victim's initial description of [the front-seat robber] and [Henry's] actual appearance" (State brief on appeal at 44). Mitchell had observed the front-seat robber at close range for some 10 minutes during the robbery and had given the police a description a mere 20 minutes thereafter. As shown by the police complaint report, Mitchell's initial description was that the front-seat robber was some 20 years of age, was 5'5" tall, weighed 120 pounds, and had short hair; Henry, however, was 18 years old, 5'9" tall, weighed 160 pounds, and had a full head of hair. In addition, Mitchell told the police that that robber had a gold tooth; Henry, when arrested, had no such tooth, and Person testified that in the four years she had known Henry, living with him for two, he had never had a gold tooth. Thus, Watts brought out that, in contrast to the description Mitchell had given the police immediately after the robbery, Henry was the wrong age, the wrong height, the wrong weight, had the wrong hair style, and had no gold tooth. Small wonder, then, that on this appeal the State describes Watts's presentation of the misidentification defense as "cogent," "persuasive[ ]," and "convincing[ ]" (State brief on appeal at 48, 22, 13).

The State's weakened case was bolstered, however, by the false alibi evidence. Although the State argues on this appeal that the false alibi evidence was simply inconsequential and had no more effect than if no alibi had been offered, the record does not support that characterization. According to the ADA on summation, Watts's promise of an alibi defense was "a big thing" that had had "everybody ... up on the edge of their seat." (Tr. 349.) The ADA proceeded to hammer home the fact that Person gave Henry an alibi only for the wrong time period. *See* Tr. 350 ("wrong day"), *id.* at 354 ("wrong day"), *id.* at 355 ("wrong night"), *id.* at 364 ("I'm going to finish up by just reminding you that the defendant presented a witness

who is obviously interested. She gave the wrong alibi date.".)

Moreover, as the district court noted, the ADA was able to "capitalize[ ] on counsel's reliance on th[e] fallacious [alibi] defense" by "argu[ing] that the alibi was fabricated and suggest[ing] that the fact that Person had testified about the wrong day was evidence of the fabrication." *Henry IV* at 3. Thus, the ADA argued to the jury that the entire attempt at an alibi defense was a "story" that had been carefully contrived to avoid amenability to extrinsic corroboration or contradiction. He argued that "the alibi witness ... come[s] in here and say[s] we were alone .... [b]ecause then there is nobody to corroborate.... If they went to the movies, there would be ticket stubs possibly, there would be other people who saw them. *It is very easy to say we were supposed to do something, we stayed home. That's why they went with that story.*" (Tr. 355 (emphasis added).)

In sum, "consider[ing] the totality of the evidence before the ... jury," *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052, and bearing in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support," *id.* at 696, 104 S.Ct. 2052, we lack confidence that the result of Henry's trial was reliable, given the lack of any evidence to connect Henry to the crime other than his selection from an arguably suggestive lineup, and the subsequent identification at trial, by a victim whose initial description of the robber differed from Henry as to, *inter alia*, age, height, weight, and hair length. We cannot conclude, given the persuasive misidentification defense, that there is no reasonable probability that, but for counsel's professionally deficient representation in devoting a significant portion of the defense to the presentation of false

alibi evidence that was irrelevant to show Henry's innocence and instead suggested his consciousness of guilt, the result of the trial would have been different. We conclude that Henry's Sixth Amendment right to the effective assistance of counsel at trial was violated.

This conclusion does not end our inquiry, however, for a state prisoner seeking a federal writ of habeas corpus on the ground that he was denied effective assistance of counsel must show more than simply that he meets the *Strickland* standard. Under 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the state court's decision rejecting his claim is to be reviewed under a more deferential standard than simply whether that decision was correct.

## B. *The AEDPA Standards*

 When, as here, the state court has rejected the petitioner's claim on the merits, a federal court considering a habeas corpus petition under 28 U.S.C. § 2254, as amended by AEDPA, must defer to the state court's rejection of the claim, and must deny the writ unless (to the extent pertinent here) the state-court adjudication (1) "was contrary to," or (2) "involved an unreasonable application of," clearly established federal law "as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); *see Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Thus, a petitioner whose claim is that he received ineffective assistance of counsel not only must satisfy the *Strickland* standard but also must show that the state court's rejection of his claim either was contrary to *Strickland* or was an unreasonable application of *Strickland*, *see, e.g., Williams*, 529 U.S. at 412–13, 120 S.Ct. 1495; *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843,

152 L.Ed.2d 914 (2002); *Eze v. Senkowski,* 321 F.3d 110, 122 (2d Cir.2003) (*"Eze"*); *Loliscio v. Goord,* 263 F.3d at 184, 192–93; *Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001) (*"Lindstadt"*).

■■■■ A state-court decision is "contrary" to clearly established federal law within the meaning of § 2254(d)(1) if it is "diametrically different" from, "opposite in character or nature" to, or "mutually opposed" to the relevant Supreme Court precedent. *Williams,* 529 U.S. at 405, 120 S.Ct. 1495 (internal quotation marks omitted). Thus, a federal court may grant habeas under the "contrary to" clause "if the state court arrive[d] at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decide[d] a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495.

■■■■ The "unreasonable application" standard is independent of the "contrary to" standard; and it is less clearly defined. The *Williams* Court made clear, however, that although " 'unreasonable' is no doubt difficult to define," *id.* at 410, 120 S.Ct. 1495, the term "unreasonable application" of federal law means more than simply an "erroneous" or "incorrect" application, *id.* at 411, 120 S.Ct. 1495; *see, e.g., Bell v. Cone,* 535 U.S. at 694, 122 S.Ct. 1843. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495.

■■■■ On the other hand, *Williams* also made clear that a federal habeas court may permissibly conclude that federal law has been unreasonably applied by the state court even though not all reasonable jurists would agree that the state court's application was unreasonable. *See* 529 U.S. at 409, 120 S.Ct. 1495 (appellate court's ruling that a state-court decision can constitute an "unreasonable application ... only if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable" was "erroneous" (internal quotation marks omitted)). Rather, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable." *Id.* at 409, 120 S.Ct. 1495 (emphasis added). The *Williams* Court concluded that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

■■■■ In light of the *Williams* discussion, this Court has concluded that an "objectively unreasonable" application of Supreme Court precedent falls somewhere between "merely erroneous and unreasonable to all reasonable jurists." *Francis S. v. Stone,* 221 F.3d 100, 109 (2d Cir.2000). "Some increment of incorrectness beyond error is required," but that "increment need not be great." *Id.* at 111.

C. *Application of the AEDPA Standards to* Henry II

As discussed in Part I.B. above, the N.Y. Court of Appeals in *Henry II* rejected Henry's ineffective-assistance-of-counsel claim, using its "flexible approach," 95 N.Y.2d at 565, 721 N.Y.S.2d at 578, 744 N.E.2d 112 (internal quotation marks omitted), which had been enunciated in *People v. Baldi,* 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 898, 429 N.E.2d 400 (1981) (*"Baldi"*),

prior to the Supreme Court's 1984 decision in *Strickland.* Under that approach

"[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met" (*People v. Baldi,* 54 N.Y.2d, at 147, 444 N.Y.S.2d 893, 429 N.E.2d 400). The core of the inquiry is whether defendant received "meaningful representation."

*People v. Benevento,* 91 N.Y.2d 708, 712, 674 N.Y.S.2d 629, 632, 697 N.E.2d 584 (1998) (*"Benevento"*). The N.Y. Court of Appeals has noted that this approach differs from the standard set forth in *Strickland. See, e.g., Henry II,* 95 N.Y.2d at 566, 721 N.Y.S.2d at 579, 744 N.E.2d 112 ("[t]his Court has previously recognized the differences between the Federal and State tests for ineffectiveness, and has consistently adhered to the application of our 'meaningful representation' test"); *Benevento,* 91 N.Y.2d at 713, 674 N.Y.S.2d at 633, 697 N.E.2d 584 ("prior to *Strickland,* we had 'developed a somewhat different test for ineffective assistance of counsel under article I, § 6 of the New York Constitution from that employed by the Supreme Court in applying the Sixth Amendment' (*People v. Claudio,* 83 N.Y.2d 76, 79, 607 N.Y.S.2d 912, 629 N.E.2d 384)."); *People v. Claudio,* 83 N.Y.2d 76, 79, 607 N.Y.S.2d 912, 914, 629 N.E.2d 384 (1993) (same) (*"compar* [ing] *People v. Baldi,* 54 N.Y.2d 137, 147, 444 N.Y.S.2d 893, 429 N.E.2d 400, ... *with Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674").

The acknowledged difference between the *Strickland* and the New York standards is that, under *Strickland,* when counsel's performance has been judged unreasonably deficient, an ineffective assistance claim is established if the court concludes that "but for counsel's unprofessional errors, there is a 'reasonable probability' that the outcome of the proceedings would have been different," *Henry II,* 95 N.Y.2d at 566 n. *, 721 N.Y.S.2d at 579 n. * (quoting *Strickland,* 466 U.S. at 687, 694, 104 S.Ct. 2052), whereas the New York standard's "prejudice component ... focuses on the 'fairness of the process as a whole *rather than [any] particular impact on the outcome of the case* ' (*People v. Benevento, supra,* 91 N.Y.2d, at 714, 674 N.Y.S.2d 629, 697 N.E.2d 584)," *Henry II,* 95 N.Y.2d at 566, 721 N.Y.S.2d at 579, 744 N.E.2d 112 (brackets in *Henry II* ) (emphasis ours).

In *Benevento,* the N.Y. Court of Appeals stated that while its flexible

inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case.... *Thus, whether defendant would have been acquitted of the charges but for counsel's errors is relevant, but not dispositive under the State constitutional guarantee of effective assistance of counsel.*

*Benevento,* 91 N.Y.2d at 714, 674 N.Y.S.2d at 633, 697 N.E.2d 584 (emphasis added). Thus, "[w]hereas both tests contain a prejudice component, the touchstone of the New York test is 'the fairness of the process as a whole,' *Benevento,* [91 N.Y.2d at 714,] 674 N.Y.S.2d at 633, while the federal test considers the outcome of the proceeding for the defendant, *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 ...." *Eze,* 321 F.3d at 123.

Notwithstanding that difference, this Court has ruled on at least three occasions that the New York standard as articulated in *Baldi* (*i.e.,* "[s]o long as the evidence,

the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met," 54 N.Y.2d at 147, 444 N.Y.S.2d at 898, 429 N.E.2d 400) is not "contrary to" the *Strickland* standard for purposes of § 2254(d)(1). *See Lindstadt,* 239 F.3d at 198 ("standard applied by the state court is not diametrically different, opposite in character or nature, or mutually opposed to the standard articulated in *Strickland*" (discussing *Baldi*) (internal quotation marks omitted)); *Loliscio v. Goord,* 263 F.3d at 193 (same) (discussing a N.Y. Court of Appeals case quoting *Baldi*); *Eze,* 321 F.3d at 122–24 (same) (discussing *Baldi, Benevento,* and *Henry II*).

In *Eze,* 321 F.3d at 124, we noted that, in the absence of a contrary decision by this Court en banc, or an intervening Supreme Court decision, we are bound to follow the precedents set in *Lindstadt* and *Loliscio v. Goord* that the N.Y. Court of Appeals standard is not "contrary to" *Strickland.* Although, plainly, we are so bound, and although we thus premise our determination in the present case on the "unreasonable application" clause of § 2254(d)(1), we pause to question whether the New York standard is not contrary to *Strickland* within the framework set forth in *Williams.* A conclusion that the two standards are not diametrically different, opposite in character or nature, or mutually exclusive is plainly correct at the level of generality that focuses on the State standard in broad terms. Taking an overview, the New York principle, *i.e.,* that a defendant must have meaningful representation sufficient to ensure that the process as a whole is fair, surely is not diametrically different from, opposed to, or inconsistent with the *Strickland* standard, which, in broad terms requires professionally competent assistance or at least assistance that (albeit incompetent) does not render the result of the proceeding unreliable, and hence make the proceeding itself unfair.

We are hardly sure, however, that comparison at that level of generality is appropriate. In *Williams,* the Supreme Court stated as follows:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Take, for example, our decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence* that the result of his criminal proceeding would have been different, *that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed"* to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a "reasonable probability that ... the result of the proceeding would have been different." *Id.,* at 694, 104 S.Ct. 2052.... *[In this] scenario[], a federal court will be unconstrained by § 2254(d)(1) because the state-court decision falls within that provision's "contrary to" clause.*

*Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495 (emphases added). Plainly the quantum of proof established by *Strickland* as necessary to uphold the prejudice prong is but one part of the *Strickland* standard. *Williams* thus indicates that in order to be "contrary to" the federal standard, a state-law principle need not be diametrically different from, or opposite in character to, or mutually opposed to, the federal standard *in toto.* Rather, in the example given by *Williams,* if the state court's rejection

of a claim is grounded on part of a state-law principle that is inconsistent with part of the *Strickland* standard, it meets the AEDPA "contrary to" test. Thus, in light of the *Strickland* principle that an ineffective assistance claim is established if the court concludes that there is a reasonable probability that but for counsel's professionally deficient performance the outcome of the proceeding would have been different, we find it difficult to view so much of the New York rule as holds that "*whether defendant would have been acquitted of the charges but for counsel's errors is ... not dispositive,*" *Benevento,* 91 N.Y.2d at 714, 674 N.Y.S.2d at 633, 697 N.E.2d 584 (emphasis added), as not "contrary to" the prejudice standard established by *Strickland.*

■ Nonetheless, in the present case we need not make a determination under the "contrary to" clause, for we conclude that the *Henry II* Court's rejection of Henry's ineffective-assistance-of-counsel claim was at least an objectively unreasonable application of *Strickland.* The N.Y. Court of Appeals clearly identified the federal standard, correctly stating the two-pronged *Strickland* test, *see Henry II,* 95 N.Y.2d at 566 n. *, 721 N.Y.S.2d at 579 n. *, but, noting the difference between the *Strickland* test and the New York test, did not, in our view, reasonably apply either prong of *Strickland.*

As discussed in Part II.A. above, we have concluded that counsel's presentation of and continued emphasis on Person's alibi testimony for the wrong date—evincing a persistent inability to focus on the difference between the beginning and the end of the day—fell well below the required level of professional competence. And given the fact that Person's testimony that Henry was with her on Thursday night had no probative value to establish Henry's innocence of a crime that undisputedly had

occurred 24 hours earlier, and that the presentation of a false alibi can be taken as evidence of consciousness of guilt, counsel's insistence on presenting and adhering to the non-alibi alibi cannot objectively reasonably be deemed merely a matter of strategy rather than unprofessional error. The fact that the N.Y. Court of Appeals deemed Watts's presentation of the false alibi defense to be a "tactic" does not alter our view; as *Williams* instructs, *see* Part II.B. above, a decision may constitute an objectively unreasonable application of federal law even if, as to the reasonableness of application, some reasonable jurists would reach a contrary conclusion. *See* 529 U.S. at 409, 120 S.Ct. 1495; *see also Loliscio v. Goord,* 263 F.3d at 195 ("We find ... that trial counsel's performance was objectively unreasonable, and thus that the state court's determination to the contrary constituted an unreasonable application of the first prong of *Strickland.*").

We conclude as well that the N.Y. Court of Appeals's decision that Henry had not made a sufficient showing of prejudice resulting from counsel's presentation of the false alibi defense constituted an objectively unreasonable application of *Strickland*'s test for prejudice. The *Henry II* Court's view that "counsel's presentation of the alibi testimony did not diminish the *legitimacy* of defendant's misidentification defense," 95 N.Y.2d at 566, 721 N.Y.S.2d at 579, 744 N.E.2d 112 (emphasis added), does not reasonably apply *Strickland* because it does not appear to consider the false alibi defense's likely effect on the jury. The very promise of an alibi, to support the defense of misidentification, had the jurors, in the words of the ADA, "up on the edge of their seat[s]" (Tr. 349). When Person's testimony proved to provide only a phony alibi, it enabled the ADA not only to emphasize repeatedly that it was for the wrong date, but also to argue that Person's alibi testimony was a "story"

that she and Henry had carefully contrived to avoid both the need for corroboration and the possibility of contradiction (Tr. 355 ("It is very easy to say we were supposed to do something, we stayed home. That's why they went with that story.")). As it is "axiomatic," *United States v. Parness,* 503 F.2d at 438, that the presentation of false exculpatory evidence in general, and false alibi evidence in particular, is likely to be viewed by the jury as evincing consciousness of guilt, the false alibi defense here, while not diminishing the "legitimacy" of the misidentification defense, may well have diminished its effectiveness. And the *Henry II* Court's reliance on "counsel's competency in all other respects," 95 N.Y.2d at 566, 721 N.Y.S.2d at 579, 744 N.E.2d 112, failed to apply the *Strickland* standard at all.

Accordingly, we conclude that the state court's rejection of Henry's federal ineffective-assistance-of-counsel claim is not entitled to AEDPA deference, and that his petition for a writ of habeas corpus should be granted.

Ordinarily, when we have found potential merit in a claim that counsel has provided constitutionally ineffective assistance, we do not order the granting of habeas corpus without offering counsel " 'an opportunity to present evidence, in the form of live testimony, affidavits, or briefs.'" *Cox v. Donnelly,* 387 F.3d 193, 201 (2d Cir.2004) (quoting *Bloomer v. United States,* 162 F.3d 187, 194 (2d Cir. 1998)). In the present matter, however, the record already contains Watts's explanations for his presentation of the alibi defense, to wit, his affidavit in Henry's § 440.10 proceeding. Accordingly, we conclude here that no further hearing is necessary.

## CONCLUSION

For the reasons stated above, we reverse the judgment of the district court and remand for the entry of a judgment that conditionally grants the writ, ordering the State to release Henry unless it provides him with a new trial within 90 days of the date of this decision.

SACK, Circuit Judge, concurring.

I fully concur in the thorough and thoughtful opinion of Judge Kearse. I pause to note that it expresses doubt about our previously stated view that the New York Court of Appeals rule as to ineffective assistance of counsel, *see, e.g., People v. Benevento,* 91 N.Y.2d 708, 697 N.E.2d 584, 674 N.Y.S.2d 629 (1998), is not "contrary to" federal law clearly established by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ante at 68–71. The opinion cites (and therefore casts doubt upon the conclusion in) three of our decisions: *Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001) ("The standard applied by the state court is not diametrically different, opposite in character or nature, or mutually opposed to the standard articulated in *Strickland.*") (citation and internal quotation marks omitted); *Loliscio v. Goord,* 263 F.3d 178, 193 (2d Cir.2001) (same, citing *Lindstadt* ); *Eze v. Senkowski,* 321 F.3d 110, 123–24 (2d Cir.2003) (same, citing *Lindstadt* and *Loliscio,* but noting in that connection, as Judge Kearse does here, ante at 70, "that we are compelled to follow the decisions of earlier panels unless they have been called into question by an intervening Supreme Court decision or by one of this Court sitting *in banc* ") (citation and internal quotation marks omitted).

Because I concurred in *Lindstadt,* I write separately to note that I nonetheless find considerable merit in Judge Kearse's criticism of the rule. Our decision here does not turn on its correctness. If and

when we are required to decide an appeal that does, assuming that the Supreme Court does not give us guidance in the interim, we might be well advised to consider the appeal for *en banc* review as a means to reconsider the issue. *Cf. Landell v. Sorrell*, 406 F.3d 159 (2d Cir.2005) (Sack, *J.* and Katzmann, *J.;* concurring in denial of rehearing *en banc* ).